725 So.2d 66 (1998)
Gwendolyn M. WILSON
v.
PNS STORES, INCORPORATED (a/k/a Pic'n Save Stores, Incorporated), MacFrugal's Incorporated, Thomas Grillo and John R. McCullough.
No. 98-CA-1004
Court of Appeal of Louisiana, Fourth Circuit.
December 16, 1998.
*67 Jeffrey A. Schwartz, Audrey N. Browne, Schwartz & Browne, L.L.C., New Orleans, Louisiana, Attorneys for Plaintiff/Appellee, Gwendolyn Wilson.
Elizabeth Smyth Sirgo, Chopin, Wagar, Cole, Richard, Reboul & Kutcher, L.L.P., Metairie, Louisiana, Attorney for Defendant/Appellant, PNS Stores, Inc.
Court composed of Judge WILLIAM H. BYRNES III, Judge STEVEN R. PLOTKIN, and Judge PATRICIA RIVET MURRAY.
MURRAY, Judge.
Gwendolyn M. Wilson filed this suit against her former employer, PNS Stores, Inc., d/b/a MacFrugal's Bargain Closeouts ("MacFrugal's"), asserting that she had been fired because of her pregnancy in violation of La. R.S. §§23:1006, 1008, and 51:2232 et seq. After a five-day trial, a twelve-member jury awarded Ms. Wilson $268,345 in compensatory damages based upon its determination that "the plaintiff's pregnant condition was at least a motivating factor" in MacFrugal's decision to fire her. Judgment was entered on the jury verdict, with additional awards of $1,250 for an expert witness and $60,000 in attorney fees.
MacFrugal's has appealed, contending that a de novo review is required because the erroneous verdict resulted not only from the use of an incorrect legal standard in the jury instructions and interrogatories, but also from the trial court's improper questioning of its witnesses and from prejudicial remarks during plaintiff's closing argument. The defendant further claims that the determination of liability must be reversed because it is contrary to the law and evidence, and that the damages awarded, by the court as well as by the jury, are unsupported by the record and must be reduced, if not vacated.
For the reasons which follow, we vacate the judgment and remand for a new trial.

FACTS
Gwendolyn Wilson was hired by MacFrugal's on September 27, 1993 as an hourly production employee in the New Orleans distribution center.[1] She became pregnant shortly thereafter, but this was not medically confirmed until January 25, 1994.
Ms. Wilson's first performance evaluation, prepared at the conclusion of a ninety-day probationary period, was delivered and discussed *68 with her on January 13, 1994. While she received an overall performance rating of "meets standards," her unsatisfactory attendance and punctuality was emphasized in three different sections of the appraisal form. Her supervisor, Thomas Grillo, testified that another probationary employee with such a record would probably have been discharged immediately. However, he decided to convert Ms. Wilson to permanent status because she exceeded MacFrugal's standards for quality and accuracy and met the standards for quantity of work.
Ms. Wilson's performance was reviewed again at the end of February 1994, when all MacFrugal's employees were evaluated in connection with the company's annual salary adjustment plan. Mr. Grillo met with Ms. Wilson on March 7, 1994 to deliver this appraisal and discuss it with her. Since the close of her probationary period she had missed three days of work due to illness, was tardy on four days, and left early twice. This record had earned Ms. Wilson six points under MacFrugal's Absenteeism Control Program, which provided that twelve points in a six-month period generally would warrant termination. Accordingly, she was again rated unsatisfactory on attendance, with the express written warning that "this will eventually lead to termination" if not corrected immediately. Ms. Wilson's overall rating was "needs improvement," but the evaluation form indicated she met MacFrugal's production standards for both quantity and quality.
At trial, Ms. Wilson testified that Mr. Grillo made it very clear at this appraisal conference that her failure to improve her attendance could result in the loss of her job, but she said there was no mention of her production statistics or of her job performance in general. Mr. Grillo testified, however, that she was informed that she was being put on probation again for sixty days, after which she would receive another evaluation. He said he specifically told her "[t]hat she would have to show improvement and get all of her rating performance areas up to par to come off probation" in sixty days, and that she knew, as did all employees, that a probationary employee could be fired if production standards were not met. Mr. Grillo further testified that Ms. Wilson did not tell him she was pregnant, nor did she say she was having problems or needed any special help in performing her job.
A few weeks later, Ms. Wilson missed four days of work, from Thursday, March 24th through Tuesday the 29th, because of problems related to her pregnancy. Upon her return to work on Wednesday, March 30, 1994, Ms. Wilson told Mr. Grillo she was pregnant and gave him a medical excuse from Charity Hospital. The note stated she had been seen in Clinic on March 24th and 28th, and Ms. Wilson explained that the other two days were spent resting at home as the doctors had instructed her. Mr. Grillo immediately consulted the distribution center's newly arrived human resources manager, John McCullough,[2] who reviewed Ms. Wilson's attendance record, then called her into his office.
According to Ms. Wilson, she advised Mr. Grillo and Mr. McCullough at this meeting that because a patient rarely saw the same doctor twice at Charity Hospital, she would not be able to obtain a doctor's excuse for all four days she had missed. Mr. Grillo and Mr. McCullough testified that a specific medical reason for each day's absence was requested only so that they would not have to assess additional points under the Absenteeism Control Program. They both further stated that they asked Ms. Wilson, as they asked other employees with a medical condition, if her pregnancy would restrict her ability to work or require any special accomodation. Her only requests were that she be allowed to sit down while working and that she be given assistance when something needed to be lifted; both requests were granted. Mr. McCullough testified that at this meeting, Ms. Wilson was expressly reminded that she was on sixty-day probation.
On April 4, 1994, Ms. Wilson received a written warning from Mr. McCullough that *69 she had now accrued eight points for absenteeism, which was "not acceptable." In summarizing the March 30th meeting, this memo stated she had been asked to provide a medical release as well as a more detailed explanation for her recent absence, but she had failed to do so. While the memo warned Ms. Wilson that "[i]t is very important that your attendance problem be corrected immediately or your employment will terminate," neither her job performance nor her probationary status was mentioned.
Although Ms. Wilson accrued no additional points under the Absenteeism Control Program, she was fired on Friday, April 29, 1994. She was told that her production statistics were unsatisfactory, and was given a "pink slip" that stated:
Ms. Wilson was evaluated in March and counseled on substandard performance. She was allowed 60 days with which [sic] to improve her performance. At this time her rating is below the rating received in March.
Ms. Wilson testified that she went into shock when Mr. McCullough told her she was fired. Until that day, no one had even mentioned that her productivity or job performance in general might be a problem; only her attendance had been at issue. However, she acknowledged on cross examination that the weekly production statistics were calculated based upon her own daily production logs, and that a production average of less than 95% was unsatisfactory according to MacFrugal's standards. While she agreed that her production records would probably have been available if she wanted to see them, she categorically denied that either the "lead" employee who calculated the averages or her supervisor, Mr. Grillo, had ever asked her to review them or to explain any deficiencies. Given this lack of warning and her imminent eligibility for unpaid maternity leave, Ms. Wilson concluded that she had actually been fired because she was pregnant.
MacFrugal's documentation in support of the termination included a third performance appraisal showing an evaluation period of March 1 to May 1, 1994. Although the form provided a check-off to indicate whether it was a 90-day or annual review, "60 day" was written in as the type of evaluation. This form states that Ms. Wilson's three-week production average since the last review was less than 84%, earning an unsatisfactory rating for quantity of work, and that three errors in the last two months merited a rating of "needs improvement" in quality and accuracy. The overall rating assigned for the period was also "needs improvement." The form was undated and had no signature, either for the employee or the supervisor. While Mr. Grillo testified that he was uncertain when he had completed this appraisal, Mr. McCullough specifically recalled that it was in file when Mr. Grillo recommended discharging Ms. Wilson, on April 28th or the morning of April 29th. It was Mr. McCullough, however, who completed the top portion regarding the type of evaluation and the period covered.
Kathy Klein, MacFrugal's corporate personnel director, explained that a permanent employee placed on probation due to an unsatisfactory performance appraisal was subject to the same standards as a new employee serving the initial 90-day probationary period, i.e., immediate termination can result if the employee falls below "meets standards" on any element of the evaluation while on probation. She admitted, however, that this was an unwritten policy and did not appear in the "New Hire Employee Handbook" or in any of the MacFrugal's policy manual excerpts admitted into evidence. Ms. Klein testified that she had reviewed this policy with Mr. McCullough when he consulted her at the end of April 1994 regarding Mr. Grillo's proposed discharge of Ms. Wilson. She recalled being told that the employee's attendance had not improved after the March evaluation, and that her production statistics had fallen below acceptable levels on both quantity and quality during the probationary period. Ms. Klein agreed that MacFrugal's policies provided for termination under such circumstances, and only then was told that Ms. Wilson was pregnant. With further questioning, however, Ms. Klein was satisfied that the problems with attendance and productivity were not attributable to the employee's pregnancy. Accordingly, she had advised *70 Mr. McCullough that he could proceed with the proposed discharge. Ms. Klein reiterated that Ms. Wilson was not fired because she was pregnant, but because she failed to meet performance standards while on probation. With a workforce that is more than 75% female, she said, MacFrugal's "would lose half of our staff right now" if the company discriminated based on pregnancy.

ARGUMENTS AND DISCUSSION

JURY INSTRUCTIONS AND INTERROGATORIES
Ms. Wilson's claim is governed by former La. R.S. §23:1008, which stated that an employee shall not be discharged "because of [her] pregnancy, childbirth, or related medical condition," as well as former La. R.S. §§23:1006 and 51:2242,[3] which prohibited discrimination based on sex, including pregnancy, in employment. Lapeyronnie v. Dimitri Eye Center, Inc., 96-2608, pp. 1-2 (La.App. 4th Cir.4/16/97), 693 So.2d 236, 237-38, writ denied, 97-1639 (La.10/3/97), 701 So.2d 207. MacFrugal's contends that under these statutes, intentional discrimination cannot be established without proof by a preponderance of the evidence that the employee would not have been discharged but for her pregnancy. The defendant maintains that because the jury was only charged that Ms. Wilson had to prove "that her pregnant condition was at least a motivating factor in the defendant's decision to discharge her," the plaintiff was relieved of proving that MacFrugal's intentionally violated the statutes. Asserting that the verdict in favor of Ms. Wilson resulted from this erroneous instruction and the use of the same lesser standard in the jury interrogatory, the defendant argues that this court must conduct a de novo review on appeal and reverse the jury's finding of liability as unsupported by the evidence.
In response, Ms. Wilson points out that Louisiana's antidiscrimination statutes are based upon Title VII of the federal Civil Rights Act, which was amended in 1991 to specify that "an unlawful employment practice is established when the complaining party demonstrates that [the protected status] was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). She contends that both logic and jurisprudence demonstrate that if the decision to fire her was "motivated" by the fact of her pregnancy, then by definition, she would not have been fired "but for" her pregnancy. Ms. Wilson asserts that, because the "motivating factor" instruction was entirely correct and there was substantial evidence that the reason given for her termination was a pretext for discrimination, the verdict is not manifestly erroneous and thus must be affirmed.
The jury was instructed as follows:
The plaintiff alleges that her former employer, MacFrugal's, terminated her employment because she was pregnant. Plaintiff must prove by a preponderance of the evidence that her pregnant condition was at least a motivating factor in the defendant's decision to discharge her, if not the sole reason.
By the phrase "motivating factor," I mean that you find that it played a role in the decision to terminate the plaintiff even though there are other factors which may have also played a role in the decision to terminate the plaintiff.
You must consider any reason or explanation stated by the defendant in its decision to terminate the plaintiff. If you should find that the defendant stated a valid reason, then you must decide in favor of the defendant unless the plaintiff proves by a preponderance of the evidence that the stated reason was not the true reason but was only pretext or an excuse for terminating the plaintiff because of her pregnancy.
In this regard, you may consider whether a non-pregnant employee would have been treated more favorable [sic] under the circumstances that existed at the time the plaintiff was terminated.
In proving her case, the plaintiff must prove by a preponderance of the evidence the following elements of her case, i.e., she *71 must prove: One, she was within the protected category of the law, that is that she was pregnant; two, that she was qualified for her job; three, that she was terminated from her job solely because she was pregnant or that her pregnancy was a motivating factor in the termination; and four, that she was replaced by a person who was not pregnant.
Now, if you should find that the plaintiff has proven each element of her case by a preponderance of the evidence, then the defendant can attempt to defeat the plaintiff's case by establishing by a preponderance of the evidence a legitimate non-discriminatory reason for the plaintiff's termination, such as poor job performance.
If the defendant satisfies its burden in proving a legitimate non-discriminatory reason for the plaintiff's termination, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason or explanation given by the employer for the plaintiff's termination is either false or just a pretext for terminating the pregnant plaintiff.
Also, despite the shifting burden between the plaintiff and defendant, the plaintiff retains the ultimate burden of proving by a preponderance of the evidence that she has been the victim of intentional discrimination.
Also, under Louisiana's at-will employment doctrine, the employer may discharge an employee, such as the plaintiff, without assigning any reason for doing so, except that the plaintiff may not be terminated solely because she is pregnant. Nor may her pregnant condition be a motivating factor in the decision to terminate her.
The adequacy of jury charges must be determined against the particular facts of a case and in light of the instruction as a whole. Williams v. Golden, 95-2712, pp. 2-3 (La.App. 4th Cir.7/23/97), 699 So.2d 102, 105-06, writ denied, 97-2788 (La.1/30/98), 709 So.2d 708. Under this standard, we find that the jury was correctly charged on the plaintiff's burden of proving intentional discrimination. As the U.S. Supreme Court explained, such a claim requires proof that "the employee's protected trait actually played a role in [the decisionmaking process] and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (emphasis added). Furthermore, because federal jurisprudence reflects the use of Title VII's language of "a motivating factor" interchangeably with the phrase "a determinative factor," see, e.g., Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994-95 (5th Cir.1996) (en banc), we cannot agree with MacFrugal's argument that a lessened standard of proof was conveyed by the trial court's use of the former phrase in its charges.
We further note that although MacFrugal's now claims that a "but for" instruction should have been given to the jury, it does not argue that the trial court erroneously rejected a proposed charge containing this standard. To the contrary, the jury was instructed, at MacFrugal's request that Ms.Wilson's ultimate burden was to prove by a preponderance "that she has been the victim of intentional discrimination." Although none of MacFrugal's proposed charges appeared to contemplate the "dual motivation" theory advanced by the plaintiff, see, e.g., Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120-24 (2d Cir.1997), under the evidence presented here the trial court correctly included the additional instruction that Ms. Wilson had to prove by a preponderance "that the reason or explanation given ... for [her] termination is either false or just a pretext." With these charges, as well as the explanation of "a motivating factor," the jury was adequately informed as to what was necessary for them to find that the plaintiff had been terminated "because of her pregnancy, in violation of former R.S. §23:1008. Accordingly, we find this assignment of error to be without merit.

JUDGE'S QUESTIONING OF WITNESSES
MacFrugal's next contends that it was prejudiced by the trial court's extensive questioning of witnesses, in violation of Article 1791 of the Code of Civil Procedure as well as Article 614 D of the Code of Evidence. The defendant maintains *72 that although the judge explained that he intended only to clarify the evidence, as permitted under Article 1791, he actually elicited evidence that was irrelevant to the legal issues in the case. It is further argued that because the court's questioning occurred primarily during defendant's direct examinations of its key witnesses, the judge interfered with the presentation of MacFrugal's legitimate defenses and thereby created the impression that the plaintiff's view of the evidence was correct. MacFrugal's asserts that it thus was deprived of a fair trial before an impartial jury, necessitating reversal of the judgment.
In contrast to MacFrugal's claims, Ms. Wilson maintains that the judge's participation at trial represented only a "limited intervention" that was directed at the witnesses for both parties. She contends that there was no reversible error because Article 1791 only prohibits comments regarding the evidence, without limiting the court's discretion to elicit relevant evidence when necessary to avoid juror confusion. If the defense was prejudiced by such evidence, Ms. Wilson argues, it "is surely a consequence of MacFrugal's case and not [the judge's] questions." Accordingly, the plaintiff asserts that the judgment must be affirmed.
Our review of the transcript reveals that throughout the first two days of trial, the court interrupted defense counsel's examination of the witnesses on numerous occasions, but during plaintiff's questioning the judge generally intervened only when objections were raised. The extent of the court's intrusion is particularly noticeable during the examination of MacFrugal's first witness, Kathy Klein. While her testimony takes up approximately eighty-four pages of the trial transcript, fully twenty-nine of those pages are dedicated to questioning by the court, rather than by counsel for either party. Although the court began with only a brief (one-half page) interruption shortly after Ms. Klein was called to the stand, it soon was engaged in extended dialogues with the witness, twice covering seven continuous pages during MacFrugal's direct examination of its witness.
More troubling than the frequency and duration of the court's intrusions, however, is the substantive nature of the questions coming from the bench. Again taking Ms. Klein's testimony as an example, it appears that MacFrugal's intended this witness to first provide an overview of the company's appraisal process, using Ms. Wilson's evaluations only as a foundation to the discussion. However, only minutes into defense counsel's examination, the court began instead to question Ms. Klein about MacFrugal's Absenteeism Control Program, including pointed queries concerning what documentation Mr. Grillo had placed into Ms. Wilson's personnel file and the extent to which his recordkeeping conformed to MacFrugal's written policies. As the judge continued to examine this witness, he repeatedly focussed his questions on where certain provisions appeared in policy documents that had not yet been addressed by the witness and emphasized the absence of those provisions she could not locate. In addition, although MacFrugal's attorney tried to make clear that Ms. Klein's role in terminating Ms. Wilson had been limited, the court persisted in questioning this witness on specific events that had occurred before she had been consulted by Mr. McCullough.
During the court's lengthy questioning of Ms. Klein, MacFrugal's attorney attempted first to unobtrusively resume direct examination, without success. When counsel made a direct but respectful plea to be allowed to continue, the court advised her to wait "until I get finished asking my questions." Finally, MacFrugal's lawyer asked for a bench conference and tactfully asked the court "to please permit me to proceed with my direct examination of this witness and to permit me to proceed with my case in chief as I see fit." The judge explained, however, that he considered it his duty "to see what goes before the jury is understandable and intelligible.... I'm not doing this either to assist the plaintiff or to torpedo the defendant,.... I'm merely trying to see that things are being presented in an easily understandable manner to a lay person."
The court's questioning of Ms. Klein lessened after the bench conference, and defense *73 counsel completed direct examination of the witness. However, shortly after Ms. Wilson's attorney began to cross examine concerning MacFrugal's disciplinary policies, the judge again took over the questioning. Proceeding almost line-by-line through various documents, the court elicited detailed testimony concerning the extent to which MacFrugal's had deviated from, or adhered to, its written procedures. This examination by the court fills nine of twenty-two transcript pages of the cross examination of Ms. Klein. The next morning, outside the presence of the jury, MacFrugal's argued for a mistrial based upon the extent of the judge's questioning of Ms. Klein, but the oral motion was denied.
Article 1791 of the Code of Civil Procedure has long prohibited a judge's comments before a jury which may be construed as an opinion on the evidence. As this court stated in Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 11 (La.App. 4th Cir.5/17/94), 638 So.2d 306, 316:
A trial judge's only proper function during a jury trial is to act as an impartial "umpire" in an adversary system. When a trial judge takes actions outside of that function, the attorneys to the action have a right to object. The only proper comments which may be made by a trial judge conducting a jury trial include the asking of supplementary questions for purposes of clarification.
This delineation of the judge's proper role is further emphasized in Article 614 of the Code of Evidence, effective January 1, 1989, which permits the court to call and question witnesses. However, when the case is to be decided by a jury, the court's participation in the trial is expressly limited by subsection D:
Exception. In a jury trial, the court may not call or examine a witness, except upon the express consent of all parties, which consent shall not be requested within the hearing of the jury. [Emphasis added.]
This restriction does not exist in the Federal Rules, nor was it contained in the draft Code submitted to the Legislature by the Louisiana State Law Institute. Instead, as explained in Comment (a) to this Article, this limitation was expressly added by a Senate Committee amendment and was intended to change the law. Although the provision has been criticized, see PUGH, FORCE, RAULT & TRICHE, Handbook on Louisiana Evidence Law 423-24, Author's Notes, note (2) to Article 614 (West 1998), it must be given effect by this court.
In this case, there is no indication that the parties consented to the court's questioning of any witnesses, establishing a violation of Article 614 D. More significantly, the trial judge clearly assumed the role of a participant in presenting the evidence to the jury rather than as an arbiter between the parties. Although the court intended only to avoid juror confusion rather than to favor either party, the record establishes that the testimony of one of MacFrugal's three witnesses was shaped by the order and substance of the judge's questions, rather than as planned by defense counsel. Notwithstanding the lack of express or obvious bias in favor of Ms. Wilson, the extent of the court's involvement must have made an impression on the jurors in violation of Article 1791.
We thus cannot agree with Ms. Wilson's characterization of the trial court's questioning in this case as either a "limited intervention" or as mere clarification of the testimony and evidence. Instead, we find the extent of the court's intrusion in the conduct of this trial substantially prejudiced MacFrugal's defense of the case, requiring that the jury's verdict be reversed and the judgment vacated.
Under most circumstances, when an appellate court reverses a jury verdict and the record is complete, an independent review is conducted and judgment is rendered on the merits. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). It has been recognized, however, that in some cases, "the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues.... Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial." Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). After diligent consideration of *74 this standard, we conclude that under these facts, a new trial is required.
At trial, MacFrugal's witnesses asserted that Ms. Wilson was fired because while on probation and with notice of her shortcomings, she failed to meet the company's performance and attendance standards. A former "lead" employee called by the plaintiff supported this contention, testifying that it was well known that an employee falling below an overall rating of satisfactory on the annual evaluation would be placed on probation. However, Ms. Wilson specifically denied being told anything more than that further attendance problems could result in termination. Because she did not challenge the accuracy of MacFrugal's records of her deficiencies, the credibility of the witnesses is of critical importance in deciding the ultimate question of the case: Was Ms. Wilson discharged in accordance with a well-established policy, or did MacFrugal's use her performance failures as a pretext to terminate her employment in anticipation of additional problems related to her pregnancy? With the conflicting testimony on this issue, this court finds it impossible to measure the effects of the trial court's persistent focus on MacFrugal's apparent deviation from written policy excerpts.
As the U.S. Fifth Circuit pointed out in Rhodes, 75 F.3d at 993-95, employment discrimination claims are rarely supported by direct evidence, resting instead on the inferences derived from the conflicting testimony of the parties. Such is the case here. Because MacFrugal's was not permitted to present its defense as it saw fit, and the weight to be accorded to the conflicting evidence depends so heavily on credibility determinations, we find that a remand for a new trial is required in the interest of justice. Accordingly, the judgment below is reversed and vacated, and the matter is remanded for a new trial. Because of this disposition, we pretermit discussion of defendant's challenges to the damage award.
JUDGMENT VACATED; REMANDED FOR NEW TRIAL
NOTES
[1] Ms. Wilson had been working there since May 1993 while employed by a temporary employment service.
[2] Mr. McCullough began working for MacFrugal's March 14, 1994, after seven years in personnel at Turner Marine.
[3] Louisiana's employment discrimination statutes have since been consolidated in Chapter 3-A of Title 23 of the Revised Statutes, §§301-354. 1997 La. Acts No. 1409, effective August 1, 1997.