816 So.2d 319 (2002)
In re Medical Review Panel Proceedings Timothy and Tammy CERNIGLIA
v.
Dr. Ronald J. FRENCH.
Timothy and Tammy Cerniglia
v.
American Continental Insurance Company and Ronald J. French, M.D.
Nos. 2000-CA-2768, 2000-CA-2769.
Court of Appeal of Louisiana, Fourth Circuit.
April 3, 2002.
*320 Peter E. Sperling, Nairda T. Colon, Gary L. Hanes, Frilot, Partridge, Kohnke *321 & Clements, L.C., New Orleans, LA, for Defendant/Appellant.
Thomas A. Gennusa II, Gina Gennusa Piacun, Law Offices of Thomas A. Gennusa II, Metairie, LA, for Plaintiffs/Appellees.
(Court composed of Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge TERRI F. LOVE).
PLOTKIN, Judge.
The pivotal issue in this appeal of a judgment in favor of medical malpractice plaintiffs, Timothy and Tammy Cerniglia, is whether the trial court committed reversible error when it admitted the testimony of two other patients of the defendant physician, Dr. Ronald J. French, who had suffered a similar complication as plaintiff, Mr. Cerniglia, suffered as a result of a similar surgical procedure performed by Dr. French. Finding that the testimony was improperly admitted, we reverse the trial court judgment and remand to the trial court for a new trial.

Facts
Mr. Cerniglia, who had suffered from sinus problems for many years, first consulted Dr. French, who was board certified in otolaryngology and head and neck surgery, on March 28, 1996. As a result of his initial examination, Dr. French found that Mr. Cerniglia had a deviated septum and chronic sinusitis. On that same date, Dr. French recommended that Mr. Cerniglia undergo two surgeries: (1) a septoplasty, designed to correct the deviated septum, and (2) a functional endoscopic sinus surgery ("FESS") to provide relief from the sinus problems. On the basis of Dr. French's recommendation, Mr. Cerniglia agreed to undergo the two surgeries in a single procedure that was scheduled for April 15, 1996. A CT scan was performed on April 4, 1996; whether that CT scan supported Dr. French's finding that Mr. Cerniglia had a deviated septum and sinus problems is disputed.
The surgical procedure was performed as outpatient surgery as scheduled on April 15, 1996. Mr. Cerniglia testified that he had a severe headache when he woke up in the recovery room, and that he reported that headache to the nurse on duty. Dr. French did not see Mr. Cerniglia in the recovery room, and Mr. Cerniglia was released to go home. At the time, both sides of Mr. Cerniglia's nose were packed with gauze. Dr. French had previously given Mr. Cerniglia some pain pills.
Mr. Cerniglia reported to Dr. French the next morning, April 16, 1996, as scheduled, for a post-operative examination during which Dr. French removed the packing from Mr. Cerniglia's nose. Mr. Cerniglia testified that he told Dr. French that he was having a very severe headache and that he felt like his brain had been bruised. Nevertheless, Dr. French sent Mr. Cerniglia home with instructions to call his office if he had any problems. Dr. French also told Mr. Cerniglia that he would be out of town, and that Mr. Cerniglia would have to talk to one of his partners if he called. On the way home from Dr. French's office, Mr. Cerniglia testified that he began to experience significant clear drainage from his nose.
Because this abnormal drainage continued throughout the night and because the severe headache persisted, Mr. Cerniglia called Dr. French's office the next morning, April 17, 1996, and was told by one of Dr. French's partners that drainage and a headache were normal. The problems continued all that night, so Mr. Cerniglia again called Dr. French's office on April 18, 1996. Dr. French's partner, Dr. Knight Worley, returned Mr. Cerniglia's call in the late afternoon of that day. When Mr. Cerniglia described his symptoms to Dr. Worley, Mr. Worley commented *322 that he might have suffered a cerebral spinal fluid ("CSF") leak, and told Mr. Cerniglia to come in early the next morning.
Mr. Cerniglia reported to Dr. Worley early on April 19, 1996. After examining Mr. Cerniglia and sending him to get a CT scan, Dr. Worley admitted him to the hospital and told him that he had indeed suffered a CSF leak, meaning that his brain fluid was leaking through a puncture hole in his cribriform plate, a thin bone separating the brain and the sinus cavity. Dr. Worley explained the serious nature of Mr. Cerniglia's condition, including the possibility that he could contract meningitus. Dr. Worley told Mr. Cerniglia that a second surgery to repair the leak would have to be performed the next morning. Dr. Worley told the Cerniglias that he would attempt to repair the hole through the nose, but that a craniotomy might be necessary.
Following the surgery to repair the leak, Mr. Cerniglia was admitted to the recovery room, apparently in stable condition. However, on April 21, 1996, Mr. Cerniglia was admitted to the Critical Care Unit ("CCU") because he was displaying signs of a severe infection, later determined to be cerebrospinal meningitus, as a result of the CSF leak. He remained in the CCU some eleven days, until March 30, 1996, when he was released from the hospital to continue his recovery at home.
The Cerniglias filed a complaint with the Louisiana Patients' Compensation Fund ("LPCF") on March 11, 1997, alleging medical malpractice against Dr. French. Following a decision by the Medical Review Panel in favor of Dr. French, the Cerniglias filed the instant medical malpractice action against Dr. French and his medical malpractice insurer, American Continental Insurance Co., asserting two causes of action: (1) negligent performance of the FESS procedure, and (2) failure to obtain informed consent. Shortly before the trial on the merits in this case, the Cerniglias settled with Dr. French for $99,999. Pursuant to the provisions of the Louisiana Medical Malpractice Act, the LPCF intervened in this action and defended the case against Dr. French at trial, pursuant to LSA-R.S. 40:1299.44.
Following a six-day trial, a jury returned a verdict in favor of the Cerniglias and against the LPCF, finding that Dr. French had negligently performed the FESS procedure and caused the Cerniglias' damages. However, the jury rejected the Cerniglias' claim based on lack of informed consent. Mr. Cerniglia was awarded $50,478 for past medical expenses, $80,000 for lost wages, and $250,000 for general damages. Mrs. Cerniglia was awarded $5,000 for loss of consortium.
The LPCF raises a single issue on appeal i.e., whether the trial court committed reversible error when it admitted the testimony of two of Dr. French's other patients, who had suffered the same complication as Mr. Cerniglia as a result of a similar surgical procedure. The Cerniglias respond by arguing that the trial court's ruling on the evidentiary issue was not error. The Cerniglias further argue that the remaining evidence is sufficient to support the jury verdict.

Admissibility of similar acts evidence
The PCF appeals the trial court judgment, asserting a single evidentiary error i.e., that the trial court improperly admitted third-party testimony from two of Dr. French's other patients who suffered CSF leaks caused by puncture holes in the cribriform plate, following Dr. French's performance of a FESS procedure. The FESS procedures performed on Mr. Cerniglia and on the two witnesses *323 were all performed within a twelve-month period.
Determination of the admissibility of evidence is generally governed by a three-part test: (1) Is the evidence relevant to the issues before the court, as required by La. C.E. art. 402? (2) Does the evidence pass the "balancing test," established by La. C.E. art. 403? and (3) Do any of the exceptions established by La. C.E. art. 404(B) apply.
The first question that this court must answer in order to determine whether the trial court properly admitted the similar acts evidence in the instant case is whether the testimony was relevant. La. C.E. art. 402 states as follows:
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.
La. C.E. art. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
The Cerniglias' primary argument that the similar acts evidence at issue in this case is relevant is based on the language of LSA-R.S. 9:2794, which requires that the plaintiff in a medical malpractice action prove the following elements by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
(Emphasis added.) The Cerniglias claim that the similar acts evidence is relevant because it shows that Dr. French lacked the necessary knowledge and skill to perform the FESS procedure.
However, we disagree with the Cerniglias' claim that the similar acts evidence was relevant to the issues presented by the instant case. The similar acts evidence offered in this case was the testimony of two of Dr. French's other patients, Brian Meissner and Nyda Brook, both of whom testified that they had submitted to FESS procedures performed by Dr. French and that they had suffered resultant CSF leaks. However, all of the medical experts who testified in this case admitted that the fact that a CSF leak occurred does not by itself prove that the surgeon negligently performed the procedure.
The record evidence in this case, including the testimony of the Cerniglias' primary medical expert in otolaryngology, Dr. Barry Schaitkin, indicates that the possibility of a CSF leak is a known result of FESS surgery, even if the doctor performs the surgery properly. This conclusion is supported by the fact that the possibility of a CSF leak was listed on the informed *324 consent form signed by Mr. Cerniglia prior to surgery in this case. In fact, most of the medical experts who testified at trial had performed surgeries that resulted in a CSF leak, although most recognized the existence of the leak during the surgery and were therefore able to repair the leak during the same procedure.
Thus, the evidence is clearthe occurrence of the leak, in and of itself, is neither proof of medical malpractice, nor proof that the physician lacked necessary knowledge or skill. Accordingly, the testimony of Mr. Meissner and Ms. Brook that they had suffered similar leaks was not relevant to prove Mr. French's lack of knowledge or skill to perform the procedure. Neither Mr. Meissner nor Ms. Brook testified that Dr. French had committed medical malpractice in their respective cases. Thus, we reject the Cerniglias' arguments based on LSA-R.S. 9:2794.
Moreover, even if the similar acts evidence at issue was relevant to the issues presented by this medical malpractice case, this court must then ask whether the evidence is admissible under the balancing test established by La. C.E. art. 403, which allows the exclusion of even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." For the reasons discussed below, we find that the third-party testimony in this case was so prejudicial that it should have been excluded, even if it was relevant.
Mr. Meissner and Ms. Brook testified that they suffered CSF leaks after submitting to FESS procedures performed by Dr. French. At the same time, neither Mr. Meissner nor Ms. Brook testified that the CSF leak they suffered was caused by negligence on the part of Dr. French. In fact, the record contains no evidence concerning the extent of the surgery performed on either Mr. Meissner or Ms. Brook, or evidence of the types of individual factors and circumstances that influence the result obtained following the surgeries at issue. Further, no evidence of negligence and causation was presented. However, when the jury heard the testimony of Mr. Meissner and Ms. Brook, it was allowed to draw the improper inference that Dr. French lacked the proper training, knowledge, and skill to perform the surgery in question, and to conclude that he was unqualified and incompetent to perform this type of surgery.
Admitting similar acts evidence in this case is similar to admitting evidence of prior arrests in criminal trials. The reason evidence of prior arrests is excluded from criminal trials is that the occurrence of an arrest is not proof of the commission of a crime; in the same way, the record in this case establishes conclusively that the occurrence of a CSF leak is not proof of medical malpractice. Evidence of prior arrests is inadmissible in criminal trials to prevent the jury from concluding that the defendant has a propensity for committing crimes; in this case, the similar acts evidence should have been excluded to prevent the jury from concluding that Dr. French has a propensity to commit medical malpractice.
Finally, we find that the similar acts evidence offered in this case does not fall under the exception established by La. C.E. art. 404(B), which governs the admissibility of evidence of "other crimes, wrongs, or acts" to prove "knowledge," among other things. The word "knowledge" appears in La. C.E. art. 404(B) in the following list of purposes for which such evidence may be admitted: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." However, the type of *325 "knowledge" contemplated by La. C.E. art. 404(B) is not the type of knowledge at issue herei.e., Dr. French's alleged lack of knowledge of the proper procedures for performing the FESS surgery obtained through training. The "knowledge" exception to the prohibition against presenting similar acts evidence established by La. C.E. art. 404(B) has been explained as follows:
Where a person's knowledge of certain facts is at issue, evidence which is probative of this issue is admissible even if it also establishes that the person in question committed other crimes, wrongs, or acts than that at issue in the present proceeding. If a defendant were accused of participating in a conspiracy to commit a certain crime and the accused raised a defense of lack of knowledge of the intent of the parties to commit the crime, evidence that he had taken part in other similar criminal conspiracies with the same individuals would fall within this exception to the general rule against the use of evidence of other crimes, wrongs, or acts.
Leefe, Louisiana Code of Evidence Practice Guide, § 404.7(f) (1991) (emphasis added). In short, La. C.E. art. 404(B) allows similar acts evidence only under certain prescribed circumstances, including circumstances where the evidence is offered to prove knowledge of facts bearing on the case at hand. In the instant case, the Cerniglias introduced the testimony of Mr. Meissner and Ms. Brook to prove lack of knowledge because of alleged inadequate medical training, a use for which similar acts evidence is not sanctioned under any circumstances. For that reason also, the trial court improperly admitted the similar acts evidence.
Accordingly, we find that the trial court improperly admitted the third-party testimony at issue in this case. The trial court judgment is therefore reversed.

Remand
This court has recently stated as follows in Estate of Cristadoro ex rel. Jones v. Gold-Kist, Inc., XXXX-XXXX (La. App. 4 Cir. 1/23/02), 819 So.2d 1034:
Generally, where a jury verdict is tainted due to a material error at trial, making it untrustworthy, then the verdict must be overturned; however, when an otherwise complete trial record exists, the general rule is that an appellate court should, if it can, render judgment on the record. Jones v. Black, 95-2530 (La.6/28/96), 676 So.2d 1067, citing Gonzales v. Xerox, 320 So.2d 163, 165 (La. 1975). See also, Lawson v. Straus, 98-2096 p. 6 (La.App. 4 Cir. 12/8/99), 750 So.2d 234, 239. Only when a view of the witnesses is essential to a fair resolution of conflicting evidence should the case be remanded for a new trial. Jones v. Black, at p. 1, 676 So.2d at 1067, citing Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). See also, Wilson v. PNS Stores, Inc., 98-1004, p. 14 (La.App. 4 Cir. 12/16/98), 725 So.2d 66, 73-74, where the case was remanded for a new trial because the credibility of the witnesses was found to be of critical importance. "With the conflicting testimony... [on a pivotal issue] this court finds it impossible to measure the effects of the trial court's persistent focus on [defendant's] apparent deviation from written policy excerpts." Because the employment discrimination claim at issue in the Wilson case turned upon proof by indirect evidence and by the inferences derived from the conflicting testimony of the parties, a remand for a new trial is required in the interest of justice. *326 Id., 819 So.2d at 1050-51 (emphasis in original). Likewise, in Wilson, cited by Cristadoro, this court stated as follows:
Under most circumstances, when an appellate court reverses a jury verdict and the record is complete, an independent review is conducted and judgment is rendered on the merits. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). It has been recognized, however, that in some cases, "the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial." Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980).
98-1004 at 14; 725 So.2d at 73.
Following our close review of the record in the instant case, we find that this is one of those rare cases where "the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues." Id. As is demonstrated by the following summary of the conflicting evidence presented at trial, this court is unable to find that the preponderance of the evidence supports the claims of either party without viewing the witnesses and having an opportunity to assess their credibility.
Louisiana jurisprudence has established the following elements that must be proved by a medical malpractice plaintiff: (1) the standard of care applicable to the defendant health-care provider (2) breach of the standard of care by the defendant health-care provider (3) cause-in-fact between the breach and the damages suffered, and (4) actual damages. Giammanchere v. Ernst, 96-2458, p. 4 (La.App. 4 Cir. 5/19/99), 742 So.2d 572, 575, citing LSA-R.S. 40:1299.39 and Bailey v. State Through Dept. of Health and Human Resources, 96-2797, p. 4 (La.App. 4 Cir. 5/21/97), 695 So.2d 557, 559. The third and fourth elements of the above test are not at issue in this case as Dr. French himself admitted that the FESS surgery he performed caused Mr. Cerniglia's CSF leak, and the record evidence relative to the Cerniglia's damages is clear. Moreover, the LPCF does not claim that the record evidence is insufficient to prove the third and fourth elements.
Concerning the first and second elements i.e., the standard of care applicable to Dr. French and Dr. French's breach of that standard of care, the Cerniglias' primary expert witness, Dr. Schaitkin, testified that Dr. French's care of Mr. Cerniglia differed from his routine care of patients in a number of ways. Dr. Schaitkin criticized Dr. French's pre-operative care of Mr. Cerniglia on the following points: (1) failing to take and record an adequate medical history on Mr. Cerniglia's initial visit; (2) failing to order a four- to six-week medical trial prior to even taking the CT scan; (3) failing to perform an endoscopic examination of Mr. Cerniglia's sinuses prior to surgery; (4) failing to perform a culture of Mr. Cerniglia's sinus mucus; (5) ordering the surgery when the CT scan was basically normal; (6) overcharging Mr. Cerniglia's insurance company for the initial consult; and (7) performing the surgery under the circumstances presented by Mr. Cerniglia's case. Dr. Schaitkin then testified as follows: "I think that it did not meet the standard of care in terms of who is a candidate for this operation." On cross examination, Dr. Schaitkin admitted that his greatest concern in this case was the indications for surgery.
Dr. Schaitkin then testified that the mere existence of a CSF leak following sinus surgery indicates that the surgeon did "something wrong." However, Dr. *327 Schaitkin also admitted that "it is within the standard of care to get a CSF leak." Dr. Schaitkin then criticized Dr. French's failure to recognize that the leak had occurred while Mr. Cerniglia was still in the operating room. Dr. Schaitkin also questioned Dr. French's decision to perform the sinus surgery before doing the nasal endoscopy. Finally, Dr. Schaitkin criticized Dr. French's post-operative care of Mr. Cerniglia because he failed to promptly investigate the possibility of a CSF leak when Mr. Cerniglia complained of a severe headache following the surgery. When asked whether the delay in diagnosing the CSF leak was a deviation from the standard of care, Dr. Schaitkin simply stated that Mr. Cerniglia's history included enough "worrisome features" to alert most otolaryngologists.
Also testifying for the Cerniglias was Dr. Ray Lousteau, who treated Mr. Cerniglia for sinus problems between 1982 and 1995. Much of Dr. Lousteau's testimony was consistent with Dr. Schaitkin's opinions, summarized above. However, Dr. Lousteau admitted that the existence of normal x-rays is not "an absolute reason not to do sinus surgery," especially when the patient has had repeated infections. The existence of a deviated septum can also provide a reason to do surgery, Dr. Lousteau said. Moreover, Dr. Lousteau admitted that he saw Mr. Cerniglia with increased frequency during the year before Dr. French performed the surgery. Dr. Lousteau also stated that not all CSF leaks are discovered during the surgical procedure.
Moreover, the evidence presented by the LPCF, including the testimony of Dr. French, contradicts the evidence presented by the Cerniglias on essentially every point. Dr. French testified that he did obtain a proper history from Mr. Cerniglia during his initial consultation, and that he recorded as much of that history as he considered necessary, although he did not record everything Mr. Cerniglia had told him. Dr. French indicated that his treatment decisions were motivated, at least in part, by Mr. Cerniglia's desire to scuba dive. Dr. French stated that he considered Mr. Cerniglia's medical history, including his symptoms, the length of time his problems had persisted, and his previous medical treatment prior to ordering the surgery. Dr. French stated that his physical examination indicated that Mr. Cerniglia had a severely deviated septum, which almost always blocks the sinuses and results in sinus problems. Dr. French stated that he presumed from Mr. Cerniglia's history and his examination that Mr. Cerniglia had sinusitis, but that he ordered x-rays to confirm that fact. Moreover, his examination of Mr. Cerniglia's nose revealed chronic inflammation of the mucus membranes, Dr. French said. Although he admitted that Mr. Cerniglia's sinus disease was rather mild, he considered Mr. Cerniglia's "specific requirements"i.e., his desire to scuba diveand the fact that his sinus problems were chronic when recommending on his first visit that Mr. Cerniglia undergo surgery. Dr. French stated that he was not committed to doing the FESS procedure when he took Mr. Cerniglia to the operating room. He knew that his deviated septum should be repaired at that time, and he was going to look at his sinuses, then make a decision about the other procedure. Post-operation, Dr. French stated at trial that he did not suspect that Mr. Cerniglia was experiencing severe pain because he never asked for a pain reliever stronger than the one Dr. French initially prescribed. Dr. French stated that he never saw any clear fluid leaking from Mr. Cerniglia's nose.
Also testifying for the LPCF was Dr. Joseph J. Creely, Jr., a otolaryngologist who served on the medical review panel in *328 this case. Dr. Creely testified that the panel concluded that the evidence did not support the conclusion that Dr. French deviated from any of the applicable standards of care. Dr. Creely noted the existence of record evidence that showed that Mr. Cerniglia had sinus problems for years prior to the surgery, and that surgery had been recommended by at least one other doctor. According to Dr. Creely, the panel concluded that the septoplasty was warranted on the basis of Mr. Cerniglia's history of nasal blockage, combined with the fact that the septum was crooked. In fact, according to Dr. Creely, surgery is the only treatment option for a deviated septum. Moreover, Dr. Creely said, the CSF leak was promptly and appropriated recognized and treated. Mr. Cerniglia's complaints to Dr. French should not necessarily have excited suspicion that he had suffered a CSF leak, Dr. Creely said, because all patients who have had sinus surgery make similar complaints. Finally, Dr. Creely said, a CSF leak like the one suffered by Mr. Cerniglia can and does occur in the absence of negligence on the part of the surgeon because it's a known risk of the procedure. Dr. Creely stated his belief that the CSF leak in this case was not caused by negligence, but because of the nature of the procedure itself.
As demonstrated by the above summary, once the improperly admitted testimony of Mr. Meissner and Ms. Brook is disregarded in this case, the conflicting evidence concerning Dr. French's alleged breach of the standard of care is so nearly equal that the interests of justice require that this case must be remanded for new trial under the standard established by Cristadoro, 819 So.2d at 1050-51, and Wilson, 725 So.2d at 73-74.

Conclusion
Accordingly, the trial court judgment in favor of the Cerniglias is reversed and the case is remanded for new trial consistent with the standards set forth in this decision.
REVERSED; REMANDED FOR NEW TRIAL.
WALTZER, J., concurs in part and dissents in part.
LOVE, J., concurs in result.
WALTZER, J., concurs in part and dissents in part.
I concur in the well-reasoned majority opinion that the trial court improperly admitted the third-party testimony at issue and for that reason the judgment should be reversed. However, I believe that the evidence is such that a complete record is before us and, under the rule of Ganzales v. Xerox, 320 So.2d 163, 165 (La. 1975) and its progeny, this Court is required to render judgment on the record.
My review of the evidence convinces me that a view of the witnesses is not essential to a fair resolution of conflicting evidence. See, Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707, 708 (La.1980).
The majority opinion recites in clear and lucid detail the evidence adduced at trial. While the experts offered opinions that diverge in some respects, the evidence taken as a whole clearly demonstrates that plaintiff has not proved by a preponderance of the evidence that the defendant breached a standard of care with respect to his treatment of the plaintiff.
Plaintiff's expert Dr. Schaitkin, while critical of defendant's pre-operative investigation as to whether surgery was indicated, did not articulate a breach of care in the performance of the surgery. Dr. Schaitkin opined that the surgery was not, *329 in fact, necessary, based essentially on the fact that plaintiff had a normal pre-operative X-ray. Plaintiff's expert, Dr. Lousteau, who testified that he had treated plaintiff for at least a year prior to the surgery, testified that the presence of such a "normal" X-ray is not always a contraindication for surgery. Dr. Lousteau concluded that this is particularly the case where, as here, the patient has had repeated bouts of sinusitis infections. Dr. Lousteau testified that he had seen plaintiff for such repeated bouts of sinusitis with increasing frequency during the year prior to the surgery.
Balanced against this rather weak testimony presented by plaintiff is the unequivocal testimony of Dr. Creely and of the defendant that defendant acted in compliance with the standard of care for his specialty, and that the damage sustained by plaintiff was a known risk of this type of surgery, even in the absence of negligence.
Therefore, I concur in the finding that evidence of allegedly similar acts was improperly admitted below, justifying reversal of the trial court's judgment. I dissent in part, and would render judgment in favor of defendant pursuant to Gonzales.