ROSEMARY LEDET, Judge.
11 This is a podiatry malpractice case. The principal claim asserted in this case by the plaintiff, Terri Joseph Jackson (“Ms. Jackson”),[1] is the lack of informed consent. From a judgment in favor of the defendants, Gregg Williams, DPM (“Dr. Williams”), and his insurer, PACO Assurance Company, Inc., Ms. Jackson appeals. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On February 28, 2004, Ms. Jackson, then forty-one years old, first presented to Dr. Williams, a podiatrist. According to Ms. Jackson, she went to Dr. Williams because she had a corn on her right second toe that she wanted treated for cosmetic reasons. According to Dr. Williams, Ms. Jackson complained of feet and toe pain and had no corns. He contemporaneously documented her initial visit in the chart as follows:
“A 41 y.o. female was seen this date at the office for full evaluation of pain in the feet and all the toes. The patient stated that her feet have pain in the front as usual. She is having a great deal of difficulty with pain at times. The patient state[s] that she has some hurting upon palpating of that area of the feet at all times.”
| aDr. Williams’ diagnosis was heel spurs bilaterally and hammer toe of toes two to five bilaterally.[2] He also noted “[sjchedule for surgery as per patient.”
On June 15, 2004, Ms. Jackson returned to see Dr. Joseph. On this second visit, Dr. Williams again documented in the chart that she reported painful hammer toes. He further documented her desire to have surgery and her inability to do so because her new insurer would deny coverage. Dr. Joseph noted in the chart that Ms. Jackson would be notified when her insurer approved the surgery. His plan of care included the following conservative measures: wider shoes and Spenco inserts.
On July 20, 2004, Ms. Jackson returned for a third visit. According to the chart, Ms. Jackson told Dr. Williams that “she would like to have her toes and her heels surgically corrected at this time,” that “most of the pain is there at times,” that “at times, she has a difficult time in walking,” and that “none of the conservative treatment renders any resolution.” On this visit, Dr. Williams documented in the chart that he covered the following items with Ms. Jackson:
1. CBC/Diff, Chem-7, PT/PTT
2. Risks vs. Benefits
3. Surgical consent
4. Pain Medication
5. Discuss 08/10/2004 as surgery date
On August 10, 2004, Dr. Williams performed the surgery on Ms. Jackson at *210 Methodist Hospital in New Orleans. According to the operative report, the surgery was as follows:
1. Arthroplasty of the second, third, fourth, fifth PIPJ.
2. Arthroplasty of the second DIPJ, bilateral.
3. Hemiphalangectomy of the middle phalanx of the fifth digit, bilateral feet.
| ,4. Excision/resection of posterior heel spurs, bilateral.
Before the surgery, Ms. Jackson signed two consent forms: (1) the Methodist Hospital consent form for the surgery, which was entitled: “Patient Consent to Medical Treatment or Surgical Procedure and Acknowledgment of Receipt of Medical Information” (the “Methodist Consent Form”); and (2) an anesthesiologist consent form. Ms. Jackson signed the Methodist Consent Form on both July 20, 2004, at her third office visit with Dr. Williams, and on August 10, 2004, at the hospital before the surgery.[3]
On multiple occasions following the surgery, Ms. Jackson was seen by Dr. Williams for post-operative treatment. According to Ms. Jackson’s medical records, her primary post-operative complaint was with the heels of her feet. Indeed, the chart entry dated January 12, 2005, reads: “[p]atient states that her toes are doing fine.” Although a subsequent surgery to correct the problem -with her heels was scheduled for January 20, 2005, Ms. Jackson declined to have that procedure. Following the January 12, 2005 visit, Ms. Jackson never returned to see Dr. Williams. According to Ms. Jackson, she experienced the following post-operative problems: her toes were scarred and disfigured, her heels were protruding and full of fluid, she had trouble going up and down stairs, she was unable to walk the same, and she was unable to bend her toes. Unhappy with the results of the surgery, Ms. Jackson commenced this medical malpractice suit.
On July 28, 2005, Ms. Jackson filed a complaint against Dr. Williams with the Division of Administration; and a medical review panel (“MRP”) was |4convened to review the matter. On October 17, 2006, the MRP issued its decision. The MRP found that there was a material issue of fact, not requiring expert opinion, bearing on liability for a court to consider as to whether there was a proper informed consent. As to all other issues (except for informed consent) the MRP found the evidence did not support a conclusion that Dr. Williams failed to meet the applicable standard of care. In this regards, the MRP found that the operative procedure was appropriate and that the pre- and postoperative treatment was appropriate.
On November 28, 2006, Ms. Jackson filed this suit against Dr. Williams and his insurer. In this suit, she alleged, among other things, the following:
• improper diagnosis — recommending surgery to correct hammer toes when the condition did not exist;
• failure to offer non-surgical alternatives — debridement or shaving of the corns, home use of pumice stone, padding of the corn, shoe modification, medication to soften the corn, or other alternatives; and
• failure to provide informed consent— failure to inform of any non-surgical alternatives, failure to inform as to the actual surgical procedure he was going *211 to perform, and failure to disclose any risks of the surgical procedure.
In February 2012, a two-day jury trial was held in this matter. At trial, the following five witnesses testified: the plaintiff, Ms. Jackson; the defendant, Dr. Williams; two of the three podiatrists who were members of the MRP, Dr. Chantal Lorio and Dr. Michael Adley; and the preoperative care nurse, Ms. Spears.[4]
Both Dr. Lorio and Dr. Adley reaffirmed their opinion, expressed in the MRP opinion, that the pre-operative treatment, operative treatment, and post-operative treatment was reasonable, appropriate, and met the standard of care. As to the MRP’s finding that there was a material issue of fact regarding informed | ^consent, Dr. Adley explained that the reason for this finding was because “Dr. Williams mentioned in his notes that he had discussed the outcome of the surgery and certain risks with Ms. Jackson preopera-tively on several occasions. Ms. Jackson mentioned that he did not discuss it with her. It was basically Dr. Williams’ versus Ms. Jackson’s word.” Similarly, Dr. Lorio explained that the reason for this finding was because of the blanks on the consent form regarding the risks and complications of the particular procedure.[5] She further explained that the MRP could not verify whether the risks and complications were discussed with Ms. Jackson. Both doctors agreed that oral consent (ie., a conversation with the patient) would satisfy the standard of care. Both doctors also agreed the standard of care required that Dr. Williams explain the procedure — including that it involved removing the joints of the toes — and the risks of the procedure.
As to the procedure, Dr. Lorio testified that arthroplasty is a “joint-destruction” procedure; the procedure involves the removal of the joint in order to relieve pain. Dr. Adley testified that part of the procedure is to reduce the deformity and to shorten the toe. Shortening of the toe, he explained, is not really Ra risk but an outcome of the surgery. Dr. Adley also explained that Dr. Williams’ notation in Ms. Jackson’s chart that he discussed “risks versus benefits” indicated that “Dr. Williams discussed the surgical procedure and risks and benefits with the patient.”
Melody Spears, who testified by video deposition, stated that her sole connection *212 with Dr. Williams was that she worked as a pre-operative nurse in Methodist Hospital’s surgery center; she had no employment relationship with Dr. Williams. Ms. Spears had no recollection of Ms. Jackson; hence, her testimony was based solely on her review of the medical records. Ms. Spears testified that, as part of her preoperative assessment, she had Ms. Joseph resign the Methodist Consent Form; Ms. Spears also signed the form as a witness. Ms. Spears testified that, also as part of the assessment, she asked Ms. Jackson to rate her pain on a scale of “1 to 10,” with “10” being the most severe. According to Ms. Spears, Ms. Jackson rated her pain in the highest category of “7 to 10.” Ms. Spears testified that Ms. Jackson’s response to the question of what improved or worsened the pain was “taking the shoe off and that the pain that she’s ... experiencing comes strictly from having the shoe pressure.”
Ms. Jackson testified that she went to Dr. Williams for treatment of a corn on her right second toe. She testified that she complained to Dr. Williams of pain solely due to the corn on her toe when she wore pointed toe shoes. She denied complaining of pain in both feet. Dr. Williams took x-rays and informed her that she was developing hammer toe and that she had a torn Achilles tendon. He further informed her that the only way to correct the hammer toe condition was surgery. He still further informed her that her health insurance would not pay to remove the corn, but would pay for the correction of her hammer toe condition. |7She expressed her concern to Dr. Williams about the surgery interfering with her upcoming wedding; his response was that “most of his patients could start back wearing— start back working within four weeks, and they’re usually fine after the fourth week.”
Ms. Jackson admitted that she signed the Methodist Consent Form in Dr. Williams’ office and that she resigned that form at the hospital on the morning of the surgery. She denied telling the pre-opera-tive nurse, Ms. Spears, that her pain was in the highest category of “7 to 10.” She admitted that she signed an anesthesiologist consent form at the hospital, which enumerated multiple general risks. She also admitted reading the Methodist Consent Form, which included a list of general risks and a statement that “there were no guarantees from this surgery.” Ms. Jackson testified that when she was in college she took some premising courses and that she had at least three prior surgeries. She acknowledged that she was generally familiar with standard consent forms and that she was aware of the general risks of surgery. However, she testified that she “needed Dr. Williams to tell [her] ... the risks that involved the particular surgery that he was performing.”
Ms. Jackson acknowledged that she had met with Dr. Williams and, as stated on the consent form, they “discussed the common problems and risks associated -with the surgery.” She also acknowledged that on all three pre-operative visits Dr. Williams discussed the surgical procedure with her. During those discussions, Dr. Williams told her that it was a minor surgery and that the only risk was minor pain. She testified that Dr. Williams did not draw any diagrams to explain the procedure to her. Although she acknowledged that he told her that he was going to straighten out her toes and that he was going to have to cut her feet to do so, she denied being | stold any of the details regarding the surgery. Specifically, she denied being told that the surgery involved the removal of joints in her toes or that she would be unable to bend her toes again. Ms. Jackson testified that she would not have agreed to the procedure if *213 he had told her it involved removing joints in her toes because her only problem was with a corn on one toe. She further testified that if the consent form had stated there was a risk that she would be unable to bend her toes, she would have “walked out of the office.”
Dr. Williams testified that Ms. Jackson presented to his office for three postoperative visits with pain in her toes. On all three office visits he discussed with her the risks of the surgery and the procedure. On the third visit, he made an entry in the chart documenting the discussion of “risks versus benefits.” The benefits, he explained, included “relieving pain so that you can get into the shoes that you want.” He denied ever telling Ms. Jackson that it was a simple procedure; indeed, he testified that he “[njever would tell a patient that.” He testified that he told Ms. Jackson that he was going to remove the joints in her toes.
Dr. Williams further testified that not only did he obtain Ms. Jackson’s verbal consent, but he also obtained her signature on the Methodist Consent Form. He explained that the consent form was required by the hospital. When asked about the blank areas on the consent form, he testified that the reason he did not write anything in the blank areas was because he had three prior discussions with Ms. Jackson. During those discussions, he went over with Ms. Jackson the specific risks involved in the procedure. He also went over with her the drawings he made to illustrate the procedure.
On cross-examination, Dr. Williams testified that in all the one thousand arthro-plasty procedures he has performed, he has sat down with each and every 19one of those patients and explained the surgery, including the risks, benefits, and complications. More particularly, he testified that in all the cases he explained the procedure, drew diagrams to illustrate the procedure, explained that the procedure includes removal of the joint of the toe, explained the risk and complications of the procedure, and explained that the toe would not function as it did before the removal of the joint.
Ms. Joseph was allowed to proffer the testimony of Deneen Smith, a former patient of Dr. Williams. Ms. Smith testified that she went to Dr. Williams for what she thought were corns on her feet. She denied having any pain. He diagnosed her as having a hammer toe condition and recommended surgery. He described the surgical procedure as “primarily removing the corns” and told her that after the surgery her feet would be normal. He did not describe any risk involved in the procedure. Rather, he told her it was “a minor procedure.” She testified that Dr. Williams did not sit down with her and explain the surgical procedure to her. Nor did he draw any diagrams to explain what he was going to do. She denied being told by Dr. Williams that he was going to remove the joints of her toes. She testified that she only met with him once.
The jury found in favor of the defendants, Dr. Williams and his insurer. On May 30, 2012, the trial court rendered judgment dismissing Ms. Jackson’s claim against the defendants and assessing court and jury costs against her. This appeal followed.
DISCUSSION
On appeal, Ms. Jackson asserts the following three assignments of error:
1. The trial court erred in denying Ms. Jackson’s Motion in Limine prohibiting Dr. Williams from introducing any testimony at trial to alter the Consent for h (/Treatment form executed by Ms. Jackson on two sepa *214 rate dates (the Methodist Consent Form).
2. The trial court erred in granting Dr. Williams’ Motion in Limine prohibiting Ms. Jackson from calling Deneen Smith as a witness in her case-in-chief.
8. The trial court erred in refusing to permit Ms. Jackson from calling Ms. Smith as a rebuttal witness.
All three assignments of error raise evidentiary issues pertaining primarily to the informed consent claim. This court reviews evidentiary issues, such as rulings on a motion in limine and exclusion of evidence, under an abuse of discretion standard. Cusimano v. Port Esplanade Condominium Ass’n, Inc., 10-0477, pp. 6-7 (La.App. 4 Cir. 1/12/11), 55 So.3d 981, 935-36 (citing La. C.E. art. 103 and Brandt v. Engle, 00-3416, p. 10 (La.6/29/01), 791 So.2d 614, 620).[6] We separately address each of these issues.
I.
The first issue is whether the trial court erred in denying Ms. Jackson’s Motion in Limine prohibiting Dr. Williams from introducing any testimony at trial to alter the Methodist Consent Form executed by Ms. Jackson on two separate dates. Ms. Jackson acknowledges that under the Louisiana Uniform Consent Law (former La. R.S. 40:1299.40(A))[7] informed consent *215 can be either written or oral. See Siliezar v. East Jefferson General Hosp., 04-939 (La.App. 5 Cir. 1/11/05), 894 So.2d 373, 379 (rejecting the argument that the failure to obtain a written consent is malpractice per se and holding that a patient’s consent may be verbal). Nonetheless, she contends that because the Methodist Consent Form satisfies all the requirement of former La. R.S. 40:1299.40(A), the trial court erred in failing to exclude parole evidence — Dr. Williams’ testimony or his office records — to alter what was, or what was not, contained in the written consent form.
Ms. Jackson first raised this issue in response to Dr. Williams’ discovery responses and deposition testimony that he thoroughly informed her of all the risks associated with the surgical procedure. Particularly, she noted that, in response to a discovery interrogatory, Dr. Williams enumerated the specific risks of the surgical procedure that he discussed with her— but admittedly did not enumerate 11Ppn the Methodist Consent Form — as including: “excessive shortened toe, excessive bleeding, hematoma or blood under the skin, seroma or fluid under the skin, prolonged healing time, constant pain, infection, edema or excessive swelling, stiffness, numbness, reaction to sutures, keloids, hyper-tropic scars, recurrence of the deformity and continued difficulty walking.” Citing Dr. Williams’ failure to enumerate the specific risks of the procedure in the blank spaces on the Methodist Consent Form, Ms. Jackson argued in her motion in li-mine that under former La. R.S. 40:1299.40(A) no parole evidence was admissible to vary terms of this written consent form that satisfied the requirements of that statute. Stated otherwise, she argued that since the consent form was executed in compliance with former La. R.S. 40:1399(A), her consent was “presumed to be valid and effective” under the statute, La. R.S. 40:1399(B)(before 2012 amendment),[8] and parole evidence was inadmissible.
In November 2007, the trial court denied the motion in limine. In December 2007, the trial court provided written reasons for its ruling; the court reasoned that “pursuant to LSA-R.S. 40:1299.40(E)(2)(b),[9] Subsections A and C should be used conjunctively to obtain informed consent.” Although Ms. Jackson filed a notice of intent to file a writ application challenging that ruling, no writ was filed. Thereafter, the trial court judge *216 retired to run for mayor; and a new judge was assigned to the case. Ms. Jackson then filed a Motion to Re-urge the Motion in 11sLimine. The new judge denied that motion. Ms. Jackson’s writ application seeking review of that ruling was denied by both this court and the Louisiana Supreme Court. Joseph v. Williams, 11-807 (La.App. 4 Cir. 7/27/11) (unpub.), writ denied, 11-1776 (La.10/14/11), 74 So.3d 715.
On appeal, Ms. Jackson re-urges that the trial court’s interlocutory ruling denying her motion in limine was erroneous. Dr. Williams asserts two counterarguments, a procedural and a legal one. Procedurally, he contends that this evidentiary issue is not properly before this court for two reasons: (i) the lack of a contemporaneous objection at trial to the introduction of this evidence, and (ii) the law of the case doctrine. Legally, he contends that the trial court’s ruling was correct. Because we agree with Dr. Williams’ position that the trial court was legally correct in ruling that parole evidence was admissible, we pretermit addressing his procedural arguments.[10]
The law of informed consent in Louisiana is both jurisprudential and statutory. Tipton v. Campbell, 08-0139, 08-0140, p. 10 (La.App. 4 Cir. 9/24/08), 996 So.2d 27, 36; Martin v. Berthier, 09-1360, pp. 5-7 (La.App. 4 Cir. 5/19/10), 39 So.3d 774, 778-80. The governing statutory provision is former La. R.S. 40:1299.40(A). The Methodist Consent Form, as Ms. Jackson concedes, complies 1 uwith the statute. First, the Methodist Consent Form “sets forth in general terms the nature and purpose of the procedure.” La. R.S. 40:1299.40(A)(l).[11] Second, “the known *217 [general] risks” enumerated in the statute — “death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars”— are listed on the form. Id. Third, the form contains the required language that the patient “acknowledges that such disclosure of information has been made and that all questions asked about the procedure ... have been answered in a satisfactory manner.” Id. Given the Methodist Consent Form complies with the statute, Ms. Jackson contends that Dr. Williams should have been prohibited from introducing parole evidence to alter what was (or was not) contained in the written consent form.
Ms. Jackson’s contention confuses the legally distinct concepts of “written consent" and “informed consent.” Interpreting former La. R.S. 40:1299.40(A)(1), the Supreme Court in Hondroulis v. Schuhmacher, 553 So.2d 398, 418 (La.1989)(cm reh’g), emphasized that the Legislature labeled the presumption arising upon executing a written consent in compliance with the statute as one of “consent,” not “informed consent.” Id. at 417. The Supreme Court noted that the label the Legislature selected indicated that it did not intend “to impose the legal consequences of ‘informed consent’ by rule of law upon every patient who signs a 11ficonsent form but that the aim was to provide that the presumed fact (consent to encounter the risks adequately described in the consent form in layman’s terms) arises from proof of the basic fact (execution of a consent form containing such adequate risk information).” Id.
The Supreme Court in Hondroulis took judicial notice that almost a dozen other states had enacted similar statutes “clothing the writing with a presumption of validity.” Id. at 418. The Supreme Court also noted that those similar statutory enactments had not been construed to drastically change the informed consent right of action. Id. (citing Alan Meisel and Lisa D. Kabnick, Informed Consent To Medical Treatment: An Analysis of Recent Legislation, 41 U. Pitt. L.Rev. 407, 468 (1980) (hereinafter “Meisel and Kabnick ”)). Likewise, in Hondroulis, supra, the Supreme Court held that the Louisiana Legislature by enacting La. R.S. 40:1299.40 did not intend to “make substantive alterations in the informed consent doctrine.” Id. at 418.
Statutory provisions that cloth a written consent with a presumption of validity, such as La. R.S. 40:1299.40, “suggest parole evidence problems.” Meisel and Kabnick, 41 U. Pitt. L.Rev. at 471. However, this suggestion — which is the basis of Ms. Joseph’s argument regarding the inadmissibility of parole evidence to alter the Methodist Consent Form — has been uniformly rejected. “Although a signed consent form detailing the nature of the procedure and risks is evidence that the physician has obtained informed consent, it is ordinarily not conclusive of this issue.” David W. Louissell & Harold Williams, 4 MEDICAL MALPRACTICE § 22.08 at 22-44.49 (2012). Indeed, the underlying purpose of the informed consent doctrine dictates that “in most situations an oral explanation — as opposed | ^to a formalistic rendering of information— should be provided.” Meisel and Kab-nick, 41 U. Pitt. L.Rev. at 472. As the commentator explains:
[W]hen the contents of the writing are incomplete or ambiguous — such as where the form conclusorily recites that the patient has been “adequately” informed or that all questions have been “satisfactorily” answered — plaintiffs (and defendant’s) testimony must be taken in order to ascertain what was actually disclosed, and to determine *218 whether it was “adequate” or “satisfactory.” Therefore, it is unlikely that either the presumption created by the statutes or the fact that consent was obtained in writing will preclude the patient from contradicting the contents of the writing.
Id. at 472-73. As the commentator concludes, “[c]ertainly no such [written consent] form will resolve common testimonial conflicts between the doctor and the patient.” Id. at 477.
Before the enactment of the Louisiana Uniform Consent Law, the jurisprudence of this state “attached no particular legal significance to a medical consent merely because it happened to be in writing.” Hondroulis, 553 So.2d at 418. “[A] patient could introduce virtually any kind of relevant evidence to prove lack of consent or rebut the doctor’s evidence that the patient had consented to the therapy.” Id. The same is true after the enactment. See Soileau v. Med-Express Ambulance Service, Inc., 03-351, p. 9 (La.App. 3 Cir. 10/1/03), 856 So.2d 92, 98 (noting that the jurisprudence of this state has found informed consent based on a written consent form supplemented by a physician’s testimony and citing Bourgeois v. McDonald, 622 So.2d 684 (La.App. 4th Cir.1993)).[12]
Ms. Jackson’s reliance on Dawes v. Kinnett, 99-3157 to 99-3159 (La.App. 4 Cir. 1/17/01), 779 So.2d 978, as dictating a different result is misplaced. In [ )7Pawes, supra, the trial court found a lack of informed consent. In so doing, the trial court, which this court affirmed, reasoned that the doctor’s testimony that he orally informed the patient was self-serving given that the material risks were noted in neither the consent form nor the doctor’s office records. The court in Dawes, supra, thus made a credibility call based not only on the consent form, but -also on parole evidence presented at trial.
In sum, neither the- Louisiana Uniform Consent Law nor the presence of a written consent form precludes a physician from offering otherwise relevant evidence to rebut a patient’s claim of lack of informed consent. Accordingly, the trial court did not err in denying Ms. Jackson’s motion in limine.
II.
The second issue is whether the trial court erred in granting Dr. Williams’ motion in limine to exclude the testimony of his former patient, Ms. Smith, in Ms. Jackson’s case-in-chief. Ms. Jackson contends that she should have been allowed to call Ms. Smith as a witness to establish Dr. Williams’ habit (or practice) of performing unnecessary surgical procedures on patients who present for minor complaints. She contends that Ms. Smith’s testimony, coupled with her own testimony, establishes that Dr. Williams had a habit of persuading patients to submit to surgery based on his failure to disclose the risks of the surgery. Ms. Jackson emphasizes that the trial court not only allowed Dr. Williams to testify as to his habit (or routine) in obtaining informed consent, but also instructed the jury that such habit evidence could be considered in deciding the informed consent issue.[13]
*219 118Pr. Williams counters that Ms. Smith’s testimony is not proper habit evidence because it only pertains to one other specific instance. In support, he cites State v. Martin, 582 So.2d 306 (La.App. 1st Cir.1991), in which the court found a single instance insufficient to establish habit. The court in Martin reasoned that “[w]hen the evidence of a habit consists of ‘specific instances of conduct,’ the instances must be sufficient in number to warrant a finding that the habit existed or that the practice was routine.” Id. at 315; see also State v. Flowers, 574 So.2d 448 (La.App. 2d Cir.1991) (finding three instances insufficient to establish habit).
Citing Cerniglia v. French, 00-2768, pp. 5-8 (La.App. 4 Cir. 4/3/02), 816 So.2d 319, 323-25, Dr. Williams further points out that the testimony of another patient regarding an alleged similar complication is inadmissible and is “similar to admitting evidence of prior arrests in criminal trials.” Cerniglia, 00-2768 at p. 8, 816 So.2d at 324. As this court explained in Cemig-lia, “[ejvidence of prior arrests is inadmissible in criminal trials to prevent the jury from concluding that the defendant has a propensity for committing crimes; in this case, the similar acts evidence should have been excluded to prevent the jury from concluding that Dr. French has a propensity to commit medical malpractice.” Id. Given that Ms. Smith’s testimony was neither habit evidence nor otherwise admissible evidence, Dr. Williams contends that the trial court correctly excluded it. We agree.
The governing statutory provision is La. C.E. art. 406, which provides:
Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity |1swith the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
In this case, it is not disputed that the trial court correctly allowed Dr. Williams to introduce habit evidence regarding his routine of providing verbal disclosure. In contrast, the former patient’s (Ms. Smith’s) testimony was not admissible habit evidence; rather, the former patient’s testimony was inadmissible other similar acts (character) evidence. See Cardinal v. Family Foot Care Centers, Inc., 40 Ohio App.3d 181, 182, 532 N.E.2d 162, 164 (1987) (rejecting the characterization of the defendant’s former patients’ testimony that they were “cajoled into unnecessary surgery” as admissible habit evidence and determining it was inadmissible character evidence).
As this court has recognized, “[ajpart from cross-examination, Louisiana law does not permit the independent introduction into evidence of a defendant-physician’s similar medical treatment of other patients.” Beaucoudray v. Walsh, 07-0818, p. 27 (La.App. 4 Cir. 3/12/09), 9 So.3d 916, 931 (citing Cerniglia, supra). As a commentator has noted, “[wjhile courts should allow habit evidence [in informed consent cases], they should not allow for *220 mer patients to testify either that the physician informed or failed to inform them of the risks involved in the particular procedure in question under the habit evidence rule.” Justin L. Ward, Physician Habit Evidence in Informed Consent Cases, 23 J. Legal Med. 269, 279 (2002). The trial court thus did not abuse its discretion in refusing to allow Ms. Smith to testify as a witness in Ms. Jackson’s case-in-chief.
III.
12pThe final issue Ms. Jackson raises on appeal is whether the trial court erred in refusing to allow her to call the same former patient, Ms. Smith, as a rebuttal witness. According to Ms. Jackson, Ms. Smith’s testimony would have been the same as her testimony; to wit: “Dr. Williams did not inform her as to how the procedure would be performed, he told her there were no risks or complications involved with the procedure, he drew no diagrams explaining the procedure and the consent for treatment form that she signed listed no risks or complications associated with the procedure.” The gist of Ms. Jackson’s contention is that Dr. Williams “opened the door” to such rebuttal evidence by testifying that he sat down with each and every of the one thousand arthro-plasty patients on which he had performed the procedure and explained to them the risks, benefits, and the expected results. Ms. Jackson contends that Ms. Smith should have been allowed to testify as a rebuttal witness to attack (impeach) Dr. Williams’ credibility.
Rejecting this argument, the trial court excluded Ms. Smith from testifying as a rebuttal witness. In so doing, the trial court provided the following oral reasons:
I do think that it does go to habit and what he routinely does.... “Evidence which supplants that already adduced by the plaintiff is not admissible as rebuttal. Rebuttal evidence is confined to new matters adduced by the defense and not to repetition [of] the plaintiffs theory of the case.” And the theory of the ease is that he didn’t do the consent form. So that’s what this is. I don’t think he opened the door saying, “What do you do with all your patients?” I don’t think he did that. And, therefore, the Court is not going to allow Ms. Deneen Smith to testify to the jury.
Contrary to the trial court’s finding, we find that Dr. Williams opened the door by testifying that in “each and every” case he follows the same routine of disclosure.
|21A similar issue was addressed by the Arkansas Supreme Court in Arthur v. Zearley, 337 Ark. 125, 992 S.W.2d 67 (1999). In that case, the Arkansas Supreme Court held that the rebuttal testimony of three former patients regarding what the doctor told them before the surgery was admissible to contradict the doctor’s testimony about what he told “all” of his patients. The court reasoned that the three former patients’ testimony was admissible because it directly rebutted the doctor’s testimony that he routinely informed all of his patients of the risks.
As in Zearley, supra, Ms. Smith’s proffered testimony was admissible because it directly rebutted Dr. Williams’ testimony regarding what he routinely told “each and every one” of his arthroplasty patients. See La. C.E. art. 611(E) (providing that “[t]he plaintiff in a civil case and the state in a criminal prosecution shall have the right to rebut evidence adduced by their opponents.”) Ms. Smith’s proffered testimony was proper rebuttal evidence. Nor can we conclude, contrary to Dr. Williams’ contention, that the introduction of such *221 rebuttal evidence would have been unduly prejudicial. We thus conclude, under the facts presented in this case, that the trial court abused its discretion in excluding Ms. Smith as a rebuttal witness.
Our finding that the trial court made a legal (evidentiary) error in excluding such evidence does not necessarily dictate that the case be remanded for a new trial, as Ms. Jackson requests. Rather, we must determine whether the legal error was consequential — materially affected the outcome — or was harmless. Walley v. Vargas, 12-0022, pp. 4-5 (La.App. 1 Cir. 9/21/12), 104 So.3d 93, 98-99; see also Brooks v. Southern University and Agr. and Mechanical College, 03-0231, pp. 4-5 (La.App. 4 Cir. 7/14/04), 877 So.2d 1194, 1200 (noting that a de novo review should be limited to consequential errors, which are those that have prejudiced or tainted the verdict rendered).
In Walley, supra, the court outlined the following procedure for determining whether a legal error was consequential, warranting a de novo review on appeal:
If the exclusion of evidence taints a trial court’s findings, this court steps into the shoes of the factfinder and conducts a de novo review of all the admissible evidence to ensure a fair trial and a fair judgment. Nonetheless, a de novo review should not be undertaken for every evidentiary exclusion error. Rather, a de novo review should be limited to consequential errors; that is, the error prejudiced or tainted the trial court’s finding with regard to a material factual issue. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735; Wingfield v. State Department of Transportation and Development, 2001-2668 (La. App. 1st Cir.11/8/02), 835 So.2d 785, 799....
In some cases, a preliminary de novo review can be limited to a determination of the impact of the excluded evidence on the overall findings. If it is clear from the initial limited de novo review that the excluded evidence could not have permissibly changed the ultimate findings of the trier of fact, the judgment should not be vacated and reviewed de novo. In the absence of a tainted fact-finding process, the trial court’s ultimate findings are subject only to a manifest error review. See Wingfield, 835 So.2d at 799.
Walley, 12-0022 at pp. 9-10, 104 So.3d at 93.
Based on our review of the evidence in the record and our initial de novo review of Ms. Smith’s proffered testimony,[14] we find the trial court’s legal (evidentiary) error in excluding Ms. Smith as a rebuttal witness did materially affect the outcome of this case and thus is consequential. A de novo review of the | ⅞¾trial court’s factual finding thus is warranted. Walley, supra (citing Wingfield, 835 So.2d at 800); Brooks, supra.
IV.
When, as in this case, a de novo review of the record is warranted, the appellate court’s function is to make an *222 independent, de novo review of the record and to determine which party is entitled to prevail by a preponderance of the evidence. Leard v. Schenker, 11-1509, p. 3 (La.App. 4 Cir. 3/14/12), 87 So.3d 270, 272 (citing Chambers v. Village of Moreauville, 11-0898, p. 2 (La.1/24/12), 85 So.3d 593 (citing Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735)). “Proof is sufficient to constitute a preponderance when the entirety of the evidence both direct and circumstantial, shows the fact sought to be proved is more probable than not.” Hanks v. Entergy Corp., 06-477, p. 19 (La.12/18/06), 944 So.2d 564, 57. Applying this standard, we cannot conclude that Ms. Jackson met her burden of proving negligence on the part of Dr. Williams.
As to the informed consent claim, the evidence presented at trial centered on the second element required to establish an informed consent claim: “[a] failure to disclose a risk on the part of the physician.” Brandt v. Eagle, 00-3416, p. 7, n.1 (La.6/29/01), 791 So.2d 614, 618 (collecting cases).[15] The written consent form (the Methodist Consent Form) only disclosed the general risks of the procedure; |24the area on the form for listing the specific risks was left blank. On the issue of whether a verbal disclosure was made, Dr. Williams and Ms. Jackson gave diametrically opposed testimony regarding the discussions that took place during the three pre-operative visits regarding the surgical procedure.
At trial, the sole evidence Ms. Jackson offered, besides her own testimony, to support her contention that Dr. Williams failed to disclose the specific risks to her was Ms. Smith’s proffered testimony. As noted, Ms. Smith was a prior patient of Dr. Williams who had the same surgery. Ms. Smith’s testimony was virtually identical to Ms. Jackson’s testimony. Specifically, Ms. Smith’s testimony was that Dr. Williams told her that it was a very simple procedure with no risks involved, that he did not draw any diagrams for her, that he did not explain the surgery to her, and that he did not tell her he was going to take the joints out of toes. However, the sole purpose for which Ms. Smith’s testimony was admissible was to contradict Dr. Williams’ testimony that in every case he routinely has disclosed the complications, risks, and benefits of the procedure.
At trial, Dr. Williams testified in detail not only regarding what he routinely has told his surgery patients, but also what he specifically recalled having told Ms. Williams during the three pre-operative visits. He testified that he told her on three separate pre-operative visits what the surgical procedure involved and that he explained the complications, risks, and benefits of the procedure. The benefits, as Dr. Williams explained at trial, included alleviating the pain. Although Ms. Jackson testified that her pain only was from the corn on her toe when she wore pointed shoes and denied telling the pre-operative nurse that her pain was severe (in the “7 to 10” category), her testimony was contra- *223 dieted. Dr. Williams testified, consistent with his contemporaneously documented notes in the chart, that Ms. Jackson presented with pain on the three pre-opera-tive visits. Likewise, Ms. Spears testified that Ms. 12⅞Jackson rated her pain on the day of the surgery as severe.
Although Ms. Jackson testified that Dr. Williams neither explained the procedure to her nor disclosed the risks, complications, and non-surgical options, she acknowledged that during each of the three pre-operative office visits Dr. Williams discussed the surgery with her. In this respect, this case is distinguishable on its facts from Hartman v. D'Ambrosia, 95-0393 (La.App. 4 Cir. 11/30/95), 665 So.2d 1206.
In Hartman, supra, this court affirmed a finding of liability on the part of an orthopedist for failing to disclose that the outcome of the surgical procedure would not — as the patient desired and the doctor knew — enable the patient to wear high-heeled shoes again. In that case, unlike this one, the patient only saw the doctor once before surgery, and that pre-opera-tive visit was “quite brief, as little as fifteen minutes, and the time spent included some purely social conversation. This would have left little time for Dr. D’Ambrosia to give much explanation of the risks of the surgery.” Hartman, 95-0393 at pp. 1-2, 665 So.2d 1206, 1207. Unlike in Hartman, supra, in the instant case there were three pre-operative surgical visits on which Dr. Williams had the opportunity to explain the risks of the surgical procedure.
In support of his contention that he explained the risks to Ms. Jackson, Dr. Williams relied upon his contemporaneous notes in the chart. In the chart, Dr. Williams documented that he discussed the risks and benefits of the operation with Ms. Jackson at the third office visit; this was the same visit on which she first signed the Methodist Consent Form. At trial, Dr. Alden, a member of the MRP, corroborated Dr. Williams’ testimony that this “risks versus benefits” notation in the chart documented that Dr. Williams discussed the risks and benefits with Ms. |MJackson at that office visit. Accordingly, we cannot conclude, based on our de novo review of the record, that Ms. Jackson met her burden of proving by a preponderance of the evidence all the elements of a lack of informed consent claim. She failed to establish the second element — a failure to disclose a risk on the part of the physician.
As to Ms. Jackson’s malpractice claims other than informed consent, two members of the MRP, Dr. Lorio and Dr. Adley, testified at trial reaffirming their opinion, expressed in the MRP opinion, that the pre-operative treatment, operative treatment, and post-operative treatment was reasonable, appropriate, and met the standard of care. No expert evidence was presented at trial to the contrary. Hence, Ms. Jackson failed to meet her burden of proving by a preponderance of the evidence the other malpractice claims.

DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. At the time of the surgery, the plaintiff's name was Terri Joseph. Shortly after the surgery, the plaintiff was married. For ease of reference, we refer to the plaintiff throughout this opinion by her married name, Ms. Jackson.

. Hammer toe is defined as "toe where the middle joint is permanently bent downwards.” P.H. Collin, DICTIONARY OF MEDICINE 199 (3d ed.2000).

. Melody Spears, the nurse who was responsible for Ms. Jackson's pre-operative care, explained that Ms. Jackson was asked to resign the consent form at the hospital because her initial signature on the form, dated July 20, 2004, was not witnessed.

. Ms. Spears testified by video deposition in lieu of live testimony.

. The Methodist Consent Form included the following pertinent sections:
• A section entitled: “MATERIAL RISK OF TREATMENT/PROCEDURE,” which includes the following typed subsections:
(a)All medical or surgical treatment involves risks. Listed below are those risks determined by your doctor associated with this procedure that we believe a reasonable person in your (the patient’s) position would likely consider significant when deciding whether to have or forego the proposed therapy. Please ask your physician if you would like additional information regarding the nature or consequences of these risks, their likelihood of occurrence, or other associated risks that you might consider significant but may not be listed below. [The area underneath subsections (a) was left blank.]
(b) Additional risks (if any) particular to the patient because of a complicating medical condition are: [The area underneath subsections (b) was left blank.]
(c) Risks generally associated with any surgical treatment/procedure, including anesthesia are: death, brain damage, disfiguring scars, quadriplegia (paralysis from neck down), paraplegia (paralysis from waist down), the loss or loss of function of any organ or limb, infection, bleeding, and pain.
• A section entitled: “REASONABLE THERAPEUTIC ALTERNATIVES AND THE RISKS ASSOCIATED WITH SUCH ALTERNATIVES ARE:” [The area underneath this section was left blank.]

. La. C.E. art. 103 provides:
A. Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Ruling admitting evidence. When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; or
(2) Ruling excluding evidence. When the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.
B. Record of ruling. The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon.
C. Hearing of jury. Injury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or asking questions in the hearing of the jury.

. At the time of Ms. Joseph's surgery, La. R.S. 40:1299.40 (which in 2012 was repealed and replaced by La. R.S. 40:1299.39.5.) provided:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
(2) In addition to the information required to be disclosed in Paragraph (1) of this Subsection, where the medical treatment involves the surgical implantation of "Norplant” contraceptive devices, the explanation to the patient shall include the known and significant or other material risks, the known adverse results, and alternative methods of contraception.
B. Except as provided in Subsection A of this Section, no evidence shall be admissi *215 ble to modify or limit the authorization for performance of the procedure or procedures set forth in such consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.

. La. R.S. 40:1399(B), before 2012 amendment, provided that "no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such consent.”

. La. R.S. 40:1299.40(E)(2)(b), prior to the 2012 amendment, provided:
Consent to medical treatment may be evidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the Louisiana Medical Disclosure Panel pursuant to the provisions of this Subsection as another method by which to evidence a patient’s consent to medical treatment.

. As to the procedural issues, the law of the case doctrine, even when it applies, is discretionary. Frank L. Maraist and Harry T. Lem-mon, 1 LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE § 6:7, p. 134 (2d ed.2012). Insofar as the lack of a contemporaneous objection, the Louisiana Code of Evidence (La. C.E. art. 103), unlike the Federal Rules of Evidence, is silent on whether a party is required to renew an evidentiary objection on which a definite ruling is obtained pre-trial by motion in limine in order to preserve that claim for appeal. The federal rules of evidence expressly provide that "[ojnce the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal.” Federal Rules of Evidence Rule 103(b). As a commentator points out, this provision, which was added to the federal rule in 2000, eliminates the procedural trap asserted here because it "apparently eliminates the need for a party to make continuous objections, or to make an objection ‘general’ to a line of questioning." Frank L. Maraist, 19 LOUISIANA CIVIL LAW TREATISE, EVIDENCE AND PROOF § 2.7 (2012 ed.). The commentator further points out that before the 2000 amendment "federal courts adhered to the rule that a motion in limine is insufficient to preserve error in the admission of evidence where the contemporaneous objection requirement of Rule 103 is not met." Id. The commentator still further points out that "[i]f evidence is deemed admissible on a motion in limine, the opponent probably should reurge the objection when the evidence is offered at trial.” Id.

. Under the section of the form entitled: "TREATMENT/ PROCEDURE: Description, nature of the treatment/procedure,” is handwritten:
"Surgical management of painful hammer toe and posterior heel spurs by cutting skin, soft tissue and bone of the 2nd, 3rd, 4th, 5th toe and the heels of the right and left feet under local anesthesia; introduce sedation with possible general anesthesia also with the possibility of doing an Achilles tendinectomy."
Although Ms. Jackson indicates that she was unsure if this handwritten statement regarding the nature of the procedure was on the form when she signed it, the Methodist Consent Form expressly admonishes the patient regarding blanks in the form. The form includes the following patient-acknowledgement: "I have read and understand all information set forth in this document, including any attachment, and all applicable blanks were filled in prior to my signing.”

. In Soileau v. Med-Express Ambulance Service, Inc., 03-351 (La.App. 3 Cir. 10/1/03), 856 So.2d 92, the Third Circuit rejected the plaintiffs' contention that the trial court erred in denying their motion in limine, which sought to prevent the defendant from presenting evidence regarding the verbal warnings that were allegedly given to the plaintiff to supplement the written consent.

. The trial court gave the following jury instruction regarding habit evidence:
With regard to what risks were disclosed by the physician to the patient prior to *219 surgery, a doctor’s routine habit of discussing the procedure and risks associated with the procedure is admissible into evidence and may be considered by the jury to show the doctor acted in conformity with his routine practice when he discussed the risks with the patient.

. The trial court allowed Ms. Smith’s testimony to be proffered pursuant to La. C.C.P. art. 1636, which provides, in part, that ”[w]hen the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.”

. The jurisprudence has enunciated the following four-pronged test that a plaintiff asserting an informed consent claim must satisfy:
1. The existence of a material risk unknown to the patient;
2. A failure to disclose a risk on the part of the physician;
3. That the disclosure of the risk would have led a reasonable patient in the patient’s position to reject the medical procedure or choose another course of treatment; and
4. Injury.
Brandt v. Engle, 00-3416, p. 7, n.1 (La.6/29/01), 791 So.2d 614, 618 (collecting cases).