| | | |
|---|---|---|
| **TAMLA PIERRE AND CHRIS TAYLOR** | * | **NO. 2024-CA-0236** |
| | * | |
| **VERSUS** | * | **COURT OF APPEAL** |
| | * | |
| **MYRIAD GENETICS, INC., AND GREGORY ABEL** | * | **FOURTH CIRCUIT** |
| | * | **STATE OF LOUISIANA** |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-07027, DIVISION "M"
Honorable Paulette R. Irons, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Tiffany Gautier Chase, Judge Rachael D. Johnson)

Michael E. Lillis
LILLIS LAW FIRM
338 Lafayette Street
New Orleans, LA 70130

     COUNSEL FOR PLAINTIFF/APPELLANT—CHRIS TAYLOR

Scott R. Bickford
Lawrence J. Centola, III
Jason Z. Landry
MARTZELL, BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, LA 70130

     COUNSEL FOR PLAINTIFF/APPELLANT—TAMLA PIERRE

Michael C. Mims
Cherrell S. Taplin
Brady M. Hadden
LISKOW & LEWIS, APLC
701 Poydras Street, Suite 5000
New Orleans, LA 70139

Mary S. Johnson
Ingrid Kemp Laurendine
JOHNSON GRAY McNAMARA, LLC
21357 Marion Lane, Suite 300
Mandeville, LA 70471

     COUNSEL FOR DEFENDANTS/APPELLEES—MYRIAD GENETICS,
     INC., AND GREGORY ABEL

**AFFIRMED**
**September 16, 2024**

This is a negligence case arising out of the sale of genetic testing[1] to a healthcare provider-patient—Tamla Pierre. The defendants are Myriad Genetics, Inc. ("Myriad"), a molecular diagnostic company; and its former account executive (sales representative), Gregory Abel (collectively "Defendants"). The plaintiffs are Ms. Pierre and her former husband, Chris Taylor (collectively "Plaintiffs").

This is Plaintiffs' second appeal to this Court in this case. The issue in the prior appeal was whether the trial court erred in granting Defendants' summary judgment motion, based on prescription, and dismissing this case. *Pierre v. Myriad Genetics, Inc.*, 21-0320 (La. App. 4 Cir. 12/15/21), 366 So.3d 386, *writ denied*, 22-00212 (La. 3/22/22), 334 So.3d 753 ("*Myriad One*"). In *Myriad One*, this Court held that Plaintiffs "raised a genuine issue of material fact as to when Ms. Pierre acquired constructive notice sufficient to trigger the running of prescription." 21-0320, p. 17, 366 So.3d at 396. Accordingly, this Court reversed the trial court's judgment and remanded. *Id.*

_____

[1] Myriad's genetic testing evaluates a patient's risk for hereditary cancer. Medical providers can use the genetic testing results to manage the patient's treatment. Myriad's genetic tests are not "direct-to-consumer" tests; rather, a health care provider is required to order the tests for its patients. For this reason, if a provider's patient undergoes genetic testing, Myriad sends the test results to the provider, not the patient.

On remand, a five-day jury trial was held. At the close of Plaintiffs' case, the trial court granted Myriad's motion for directed verdict on Plaintiffs' direct negligence claim against it. At the close of the evidence, the jury rendered a verdict finding Mr. Abel was negligent but that his negligence was not a proximate cause of Plaintiffs' injuries (the "No-Causation Finding"). On September 28, 2023, the trial court rendered judgment in Defendants' favor, dismissing all of Plaintiffs' claims against them. From the September 28, 2023 judgment, Plaintiffs appeal.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2008, Ms. Pierre—a licensed nurse practitioner—opened A Woman's Place—a woman's health care clinic in New Orleans East. Ms. Pierre's extensive medical background included not only a nurse practitioner's license, but also a master's degree in nursing, a license to write controlled substance prescriptions, and a certification in women's health.

In 2013, Mr. Abel started working for Myriad as an account executive—Myriad's title for its sales representatives. The only qualification Myriad required its account executives have was a college degree; it did not require them to have any medical training. Mr. Abel met Myriad's requirement—he had a college degree but lacked any medical training. The training Myriad provided to Mr. Abel in 2013 was two-fold. First, it provided him with home-study materials. Second, it required that he attend a two to three week, in-person training session at Myriad's corporate headquarters in Salt Lake City, Utah. Mr. Abel's sales territory included the New Orleans area, which was where he grew up. The product that Mr. Abel marketed and sold for Myriad was its genetic testing.

In 2016, Ms. Pierre began sharing office space at A Woman's Place with another nurse practitioner, Monique Barconey; they both practiced from that

2

location. Also in 2016, Ms. Pierre met Mr. Abel through a mutual acquaintance. Starting in October 2016 (breast cancer awareness month), Ms. Pierre and Ms. Barconey began ordering Myriad's genetic testing for their patients at A Woman's Place.

At various times from 2016 to 2019, Mr. Abel was the Myriad account executive assigned to A Woman's Place. While handling the account, Mr. Abel came to A Woman's Place once or twice a week during lunchtime, dressed in scrubs. He trained both Ms. Pierre and Ms. Barconey on Myriad genetic testing; provided them with Myriad literature; helped them with various Myriad paperwork; and connected them with Myriad's medical services team, when necessary.

In December 2016, Ms. Pierre underwent Myriad genetic testing herself because of her strong family history of cancer, which included three relatives: (i) her mother, Brenda Thomas, a breast-cancer survivor; (ii) her aunt, who also had breast cancer; and (iii) her brother, who died of thyroid cancer. Ms. Barconey, who Ms. Pierre saw as a patient, ordered Ms. Pierre's genetic testing based on her strong family history. Ms. Pierre's situation was unique in that she was both a patient and a provider with whom the Myriad account executive, Mr. Abel, interacted as part of his job.

In February 2017, Myriad issued Ms. Pierre's test results in a report to her. Ms. Pierre's results read, in relevant part: "NEGATIVE - NO CLINICALLY SIGNIFICANT MUTATION IDENTIFIED." This text was at the top of the page, highlighted in green.[2] Additional text in this section read: "Note: 'CLINICALLY

---

[2] Green indicated negative test results; whereas, red indicated positive test results.

SIGNIFICANT,' as defined in this report, is a genetic change that is associated with the potential to alter medical intervention." Underneath this text, the results stated that a variant of uncertain significance ("VUS") was identified. The text further stated that "uncertain clinical significance" means that "[t]here are currently insufficient data to determine if these variants cause increased cancer risks." The report explained:

> **Details About Non-Clinically Significant Variants**: All individuals carry DNA changes (i.e., variants), and most variants do not increase an individual's risk of cancer or other diseases. When identified, variants of uncertain significance (VUS) are reported. Likely benign variants (Favor Polymorphisms) and benign variants (Polymorphisms) are not reported and available data indicate that these variants most likely do not cause increased cancer risk. Present evidence does not suggest that non-clinically significant variant findings be used to modify patient medical management beyond what is indicated by the personal and family history and any other clinically significant findings.

> **Variant Classification**: Myriad's myVision™ Variant Classification Program performs ongoing evaluations of variant classifications, in certain cases, healthcare providers may be contacted for more clinical information or to arrange family testing to aid in variant classification. When new evidence about a variant is identified and determined to result in clinical significance and management change, that information will automatically be made available to the healthcare provider through an amended report.

The report additionally advised as follows:

> Any discussion of medical management options is for general information purposes only and does not constitute a recommendation. While genetic testing and medical society guidelines provide important and useful information, medical management decisions should be made in consultation between each patient and his or her healthcare provider." Lastly, the report closed with a statement to "contact Myriad Medical Services at 1-800-469-7423 X 3850 to discuss any questions regarding this result.

At some point in February or March 2017, Mr. Abel contacted Ms. Pierre to discuss her test results. Mr. Abel admitted having this conversation with Ms. Pierre, but his version of the conversation differed from hers. Ms. Pierre's version

4

was that Mr. Abel received her test results before she did; whereas, Mr. Abel's version was that this was not possible. He represented that he never received patients' test results.

Ms. Pierre testified that, during the conversation, Mr. Abel told her that she had the same gene (VUS) as both her mother[3] and his wife—Kelly Abel—who chose to undergo a mastectomy. In contrast, Mr. Abel testified that his wife did not obtain genetic testing until 2018 (after Ms. Pierre underwent a mastectomy); that his wife's testing did not show a VUS; and that his wife never underwent a mastectomy.

Ms. Pierre also testified that, during the conversation, Mr. Abel showed her a chart to indicate that her risk of developing cancer was between 80% and 90%. Ms. Pierre testified that, based on Ms. Abel's disquieting representations, she believed that she would develop cancer and that she would need an oncologist's care. Ms. Pierre also discussed her test results with her provider, Ms. Barconey, who referred Ms. Pierre to a surgical oncologist—Dr. Alfred Colfry.

In March 2017, Ms. Pierre first presented to Dr. Colfry to discuss the possibility of a prophylactic mastectomy. Dr. Colfry's notes from that office visit stated as follows:

> Ms. Tamla Pierre Taylor is a very pleasant 44 year old with a strong family history of breast cancer and a positive genetic test result for a variant of uncertain significance of the BRCA 1 gene. 45 minutes were spent in face-to-face consultation with the patient. Greater than 50% of the time was spent counseling the patient on her current diagnosis and treatment plan moving forward. Benign clinical exam. High risk patient with a significant probability of developing breast cancer during her lifetime. We discussed the meaning of VUS in the BRCA 1 gene. We

---

[3] In 2012, Ms. Pierre's mother, Ms. Thomas, underwent Myriad genetic testing. Neither Ms. Pierre nor Ms. Thomas was aware of Ms. Thomas' 2012 Myriad testing until sometime after October 2016.

discussed that it is odd that her mother has the same variant and was diagnosed with breast cancer. She is very motivated for risk reducing prophylactic mastectomy.

In May 2017, Dr. Colfry performed the double mastectomy procedure. Immediately following the mastectomy procedure, Dr. Alireza Sadeghi performed an autologous breast reconstruction, which involved using tissue from the patient's thigh as opposed to implants (collectively the "2017 Surgery"). Although Ms. Pierre had numerous complications following the 2017 Surgery, she believed the surgery was necessary to save her life.

Approximately two years later, in April 2019, Myriad issued an amended report to Ms. Pierre. The amended report re-stated her negative result of no clinically significant mutations, but it reclassified the variant as one of no clinical significance. The amended report stated that although Ms. Pierre still carried the variant, the variant had been determined not to be a pathogenic mutation. When she received the amended report, Ms. Pierre started questioning Mr. Abel's disquieting representations and the necessity of the 2017 Surgery.

In July 2019, Plaintiffs commenced this negligence suit. In their petition, they averred that, in February and March 2017, Myriad through its sales representative, Mr. Abel, made negligent representations to Ms. Pierre about her genetic test results. They further averred that Mr. Abel's negligent representations caused Ms. Pierre to undergo an unnecessary surgery. They still further averred that Myriad was directly negligent in failing to adequately train, supervise, and oversee Mr. Abel.[4]

_____

[4] Plaintiffs also filed a variant misclassification claim against Myriad, averring that "[t]he Defendants had a duty to Plaintiff to accurately test for the BRCA gene mutations, to appropriately interpret the test results, and to appropriately report the test results in order to properly inform [Ms.] Pierre of the consequences of the test results." The trial court granted Defendants' summary judgment motion on that claim. Plaintiffs did not challenge the dismissal

Defendants denied the averments in the petition and filed multiple pre-trial motions, including a summary judgment motion based on prescription. The trial court granted the summary judgment motion. In *Myriad One*, this Court reversed and remanded. Summarizing our holding in *Myriad One*, we observed that "the information Mr. Abel conveyed, as a company employee, could reasonably have been interpreted as an enhancement of Ms. Pierre's written results, rather than notice sufficient to excite her attention of possible wrongdoing." *Myriad One*, 21-0320, p. 17, 366 So.3d at 396.

On remand, Defendants filed a no-duty summary judgment motion, which the trial court denied on August 28, 2023. In its reasons for judgment, the trial court observed there were genuine issues of material fact on both the issue of duty and scope of duty; the trial court observed:

> The Defendants claim that the Plaintiff has failed to produce any expert testimony on what the standard of care is for a sales representative in a genetic testing company and as such, there is no evidence that the Defendants owed any duty to the [P]laintiff. The Court finds that this is not a professional negligence case and as such, the Plaintiff is not required to have expert testimony on what the standard of care is. The sales representative did not require any special training to hold his position and the Court finds that a jury should be able to infer whether a duty exists or not based upon the evidence and circumstances of this case. Additionally, even if the Defendant owed no duty due to his position as a sales representative, the Court finds that there is a genuine issue of material fact as to whether he assumed a duty due to his alleged acts in assisting the Plaintiff.[5]

---

of that claim.

[5] The trial court also observed the following regarding the scope of duty:

> The Defendant also claims that the Plaintiff's injury does not fall under the Defendant's scope of duty because there is no ease of association between the Defendant's role as a sales representative and the Plaintiff's decision to get a mastectomy. Here, the Court finds that in consideration of the Defendant's alleged statements to the Plaintiff and the relationship he allegedly had with the Plaintiff, there is at least a genuine issue as to whether it was reasonably foreseeable for the Plaintiff to get treatment as a result of the Defendant's allegedly negligent actions. While it is true that the medical providers that the Plaintiff saw indicated that they likely would have recommended treatment for her even absent the genetic test

Both parties also filed motions in limine, seeking pre-trial evidentiary rulings. Only one of those motions in limine is pertinent to this appeal—Plaintiffs' motion to exclude testimony and opinions that the 2017 Surgery was a potentially life-saving surgery (the "Motion in Limine"), which the trial court denied.[6]

In September 2023, a five-day jury trial was held. At the close of Plaintiffs' case-in-chief, Defendants moved for a directed verdict, seeking dismissal of all allegations of direct negligence as to Myriad. Defendants contended that there was insufficient evidence in the record to support such claims. The trial court granted Defendants' directed verdict motion.[7] Two days later, at the close of the evidence, the jury returned a verdict in Mr. Abel's favor, answering only the first two questions on the verdict form, which were as follows:

1. Do you find, by a preponderance of the evidence, that [Mr.] Abel was negligent in his dealings with [Ms.] Pierre?

   [Jury checked "YES"] . . .

2. Do you find, by a preponderance of the evidence, that any negligence by [Mr.] Abel was the proximate cause of [Ms.] Pierre's injuries?

   [Jury checked "NO"[8]].

   If you answered "NO," please have your foreperson sign and date this form and return to the courtroom.

---

results, it may also be true that the Plaintiff would not have consulted these doctors if she had not met with the Defendant beforehand. In any case, the Court finds that this is a fact-based issue that requires a credibility determination that is not appropriate for summary judgment.

[6] Both the Motion in Limine and the directed verdict motion are discussed in detail elsewhere in this opinion, as those two motions are the basis of Plaintiffs' two assignments of error.

[7] Defendants re-raised the prescription exception at this junction, but the trial court denied it.
[8] Again, this is referred to in this opinion as the No-Causation Finding.

Thereafter, the trial court rendered judgment in Defendants' favor, dismissing all of Plaintiffs' claims against them. This appeal followed.

## DISCUSSION

On appeal, Plaintiffs assign as error the trial court's grant of Defendants' directed verdict motion and denial of Plaintiffs' Motion in Limine. We separately address each issue.

**Grant of Defendants' Directed Verdict Motion**

*Standard of Review and Principles Governing Directed Verdict Motions*

A directed verdict motion is a legal sufficiency of the evidence challenge; hence, it is subject to the *de novo* standard of review applicable to all legal issues. *See Hall v. Folger Coffee Co.*, 03-1734, p. 10 (La. 4/14/04), 874 So.2d 90, 99. The governing statutory provision is La. C.C.P. art. 1810, which provides:

> A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. . . . A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for directed verdict is effective without any assent of the jury.

This Court, in *Daspit v. Barber*, 00-1221, 00-1222 (La. App. 4 Cir. 4/11/01), 786 So.2d 962, outlined the pertinent principles governing review of a directed verdict motion as follows:

- A motion for directed verdict may be granted when, after considering all of the evidence and making all reasonable inferences therefrom in the light most favorable to the mover's opponent, it is clear that the facts and inferences are so in favor of the movant that a reasonable person could not arrive at a contrary verdict.

- Thus, if there is substantial evidence such that reasonable jurors exercising impartial judgment could reach a different decision, a motion for directed verdict should be denied.

9

- Furthermore, the trial court is given much discretion in the decision to grant a directed verdict.

- Thus, the standard of review on appeal is whether, viewing the evidence contained in the record, the court determines that reasonable people could not reach a different verdict.

- The propriety of granting a directed verdict must be reviewed in light of the substantive law underpinning the motion.

*Id.*, 00-1221, 00-1222, p. 3, 786 So.2d at 966 (internal citations omitted and reformatted).

*Application of Principles to Defendants' Directed Verdict Motion*

At the close of Plaintiffs' case, Defendants filed a directed verdict motion, re-urging the same arguments they raised in their no-duty summary judgment motion. In support of the motion, Defendants' counsel argued:

> The evidence shows there was plenty of training that Mr. Abel underwent. We have not heard testimony about what additional training should have happened. This goes back to the expert issue that we keep raising on failure to train. It is just like a negligence claim. You look to what would a reasonable person or company do under the circumstances. That is certainly an industry standard question. What sort of training should a diagnostic laboratory provide for it sales staff. We have not heard any evidence about how a jury could possibly answer that question. As to the directed verdict we are just looking at dismissal of direct negligence of Myriad, not talking about dismissing the whole case. There is still vicarious liability.

Agreeing with Defendants, the trial court granted the directed verdict motion.

On appeal, Plaintiffs contend that the trial court erred in granting Defendants' directed verdict motion and in finding that they failed to submit sufficient evidence to support their direct negligence claims against Myriad. According to Plaintiffs, they entered into the record ample proof supporting a finding that Myriad was directly negligent regarding its training, oversight, and supervision of Mr. Abel. Plaintiffs contend that a reasonable jury could have

10

reached a verdict in Plaintiffs' favor as to the direct negligence claims against

Myriad for three reasons:

- The jury could have reasonably concluded that Myriad failed to adequately train [Mr.] Abel as to the meaning of VUS, the purpose behind its internal policies, and the foreseeable consequences of his violations;

- The jury could have reasonably concluded that Myriad negligently trained [Mr.] Abel to mislead by selling diagnostic tests through fear, uncertainty, and doubt and story-telling;[9] and

- The jury could have reasonably concluded that Myriad failed to supervise and oversee [Mr.] Abel.

For these reasons, Plaintiffs contend that they were entitled to have their direct

negligence claim against Myriad decided by the jury. Plaintiffs further contend that

the trial court's rulings denying Defendants' no-duty summary judgment motion

and granting Defendants' directed verdict motion were inconsistent given the same

evidence was before the trial court when it ruled on both motions.

Defendants counter that the trial court's denial of the no-duty summary

judgment motion did not preclude it from granting a directed verdict. Defendants

further counter that the trial court properly granted Myriad's motion for directed

verdict after Plaintiffs: (i) failed to retain any expert to testify as to Myriad's

alleged liability; (ii) failed to introduce the article 1442 deposition testimony of

Myriad, and (iii) failed to introduce evidence of any direct negligence by Myriad

related to the alleged failure to train Mr. Abel.

Regardless, Defendants contend that the No-Causation Finding meant that

there was no basis for the jury to conclude that Myriad providing more or a

different type of training to Mr. Abel would have prevented Plaintiffs' injuries. In

---

[9] The 2013 home-study materials and in-person training that Myriad provided to Mr. Abel included such sales-training topics.

their appellee brief, Defendants argue that given the No-Causation Finding, "Plaintiffs could not have succeeded in proving causation as to any direct negligence by Myriad" and that Plaintiffs failed "to address this logical fallacy underpinning their appeal."

In addressing this issue, we first clarify, as Defendants contend, that the trial court's interlocutory ruling on the no-duty summary judgment motion did not preclude it from granting a subsequent directed verdict motion. As this Court has observed, "a trial court may grant a re-urged motion for summary judgment, even when no new evidence has been submitted." *Serou v. Touro Infirmary*, 15-0747, pp. 7-8 (La. App. 4 Cir. 4/13/16), 191 So.3d 1090, 1095 (internal citation and quotations omitted). The same principle applies to a subsequent directed verdict motion. Nonetheless, the trial court's ruling on the directed verdict motion is procedurally and substantively problematic.

Procedurally, the ruling is problematic in that it grants a partial directed verdict on a single theory of recovery against Myriad. The governing statute—La. C.C.P. art. 1810—is silent on whether such a partial directed verdict is allowed. *See* 1La. CIV. L. TREATISE, CIVIL PROCEDURE § 11:8 (2d ed. 2021) (observing that "[i]t is not clear whether the judge can grant a partial directed verdict, dismissing one of the plaintiff's theories of recovery or elements of damage" and citing *Hawthorne v. Southeastern Fidelity Ins. Co.*, 387 So.2d 26 (La. App. 3d Cir. 1980)).

Substantively, the ruling is problematic in that there is a strong argument that the evidence Plaintiffs presented in their case-in-chief was sufficient to preclude granting a direct verdict. Moreover, as Plaintiffs point out, their direct negligence claim against Myriad includes allegations of not only negligent

12

training, but also negligent oversight and supervision. Although Plaintiffs did not retain an expert to testify on their failure to train claim, Plaintiffs' claim against Myriad sounds in ordinary, not professional (malpractice), negligence. Thus, an expert's testimony was not required. And, although Plaintiffs did not call Myriad's 1442 deposition representative as a witness, Plaintiffs called Susan Manley—Myriad's Senior Vice-President of Medical Services and former regional sales team leader. Ms. Manley confirmed that no one from Myriad's corporate office in Salt Lake City came to New Orleans periodically to monitor Mr. Abel.

Regardless, we find it unnecessary to decide whether the trial court erred, procedurally or substantively, in granting the partial directed verdict. As Defendants correctly point out, the No-Causation Finding precludes Plaintiffs from successfully proving causation as to any direct negligence by Myriad. Put differently, given the No-Causation Finding, there was no basis to conclude that Myriad providing additional or a different type of training to Mr. Abel would have prevented Plaintiffs' injuries. Accordingly, the trial court's error, if any, in granting a partial directed verdict on Plaintiffs' direct negligence claims against Myriad was harmless. Hence, Plaintiffs' argument regarding the trial court's grant of the partial directed verdict motion is unpersuasive.

**Denial of Motion in Limine**

*Standard of Review and Principles Governing Motions in Limine*

In ruling on evidentiary matters, including motions in limine, a trial court is afforded broad discretion; and its determination is not to be disturbed on appeal absent a clear abuse of that discretion. *George v. Progressive Waste Sols. of La, Inc.,* 22-1068, p. 5 (La. 12/9/22), 355 So.3d 583, 587 (citation omitted).

The governing statutory provision is La. C.E. art. 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

"Expert testimony based on speculation, conjecture and mere possibilities cannot support a judgment." *Lott v. Lebon*, 96-1328, 96-1329, p. 8 (La. App. 4 Cir. 1/15/97), 687 So.2d 612, 618 (citation omitted).

An appellate court employs a two-part test in reviewing a trial court's evidentiary ruling. First, the appellate court must determine whether the evidentiary ruling was erroneous. Second, if the ruling was erroneous, the appellate court must determine whether the error affected a party's substantial right; if not, reversal is not warranted. *Hays v. Christus Schumpert N. Louisiana*, 46,408, p. 7 (La. App. 2 Cir. 9/21/11), 72 So.3d 955, 961. "The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case." *Palmer v. UV Ins. Risk Retention Grp., Inc.*, 18-404, p. 12 (La. App. 5 Cir. 12/19/18), 262 So.3d 1006, 1015 (citation omitted).

The party alleging prejudice resulting from a trial court's evidentiary ruling has the burden of proof. *Freeman v. Phillips 66 Co.*, 16-0247, p. 5 (La. App. 4 Cir. 12/21/16), 208 So.3d 437, 441-42 (citations omitted). "Cumulatively, errors in evidentiary rulings, coupled with other improper circumstances occurring at trial, may be so prejudicial as to deprive the parties of a fair trial, and thus may constitute reversible error, even if none of the errors considered alone would be sufficient to rise to the level of reversible error." *Lovecchio v. Romain*, 19-0779, 19-0864, 19-0865, pp. 7-8 (La. App. 4 Cir. 3/25/20), 364 So.3d 202, 209 (internal citations and quotations omitted).

*Application of Principles to Plaintiffs' Motion in Limine*

Before trial, Plaintiffs filed the Motion in Limine in anticipation of Defendants eliciting testimony from their surgical-oncologist expert—Dr. Peter Beitsch—that the 2017 Surgery was "potentially a life-saving surgery." Simply stated, Plaintiffs sought to exclude Dr. Beitsch from expressing that four-word opinion. In support, they quoted Dr. Beistch's expert report, which stated:

> [The 2017 Surgery] was not "unnecessary"—in fact, if [Ms.] Pierre never underwent that surgery, today she would remain at high-risk of developing breast cancer during her lifetime. For these reasons, the 2017 mastectomy was potentially a life-saving surgery.

Citing La. C.E. art. 403, Plaintiffs argued that Dr. Beitsch's anticipated testimony that the 2017 Surgery was "potentially a life-saving surgery" should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Defendants countered that they retained Dr. Beitsch to rebut Plaintiffs' averment in their petition that Ms. Pierre suffered damages in the form of an "unnecessary double mastectomy"—the 2017 Surgery. According to Defendants, Dr. Beitsch was prepared to render the following three opinions at trial:

- Before the 2017 mastectomy, risk models showed that Ms. Pierre had a 46.3% lifetime risk of breast cancer;

- Today, in light of the mastectomy, Ms. Pierre's lifetime risk of breast cancer is less than 5%; and

- The 2017 mastectomy was potentially life-saving surgery, because in the absence of the surgery, today, Ms. Pierre would still be at high risk of breast cancer.

By filing the Motion in Limine, Plaintiffs sought to preclude Dr. Beitsch from rendering the third opinion. Defendants argued that the requirements for invoking La. C.E. art. 403 were not met here. Dr. Beitsch's opinions directly refuted a key element of Plaintiffs' alleged damages. Further, Dr. Beitsch's opinions would

15

assist, not confuse or mislead, the jury on the issue of whether the 2017 Surgery achieved Ms. Pierre's stated goal of reducing her cancer risk. Agreeing with Defendants, the trial court denied the Motion in Limine.

On appeal, Plaintiffs contend that to sufficiently rebut their allegations that the 2017 Surgery was unnecessary and to qualify as a relevant admissible opinion testimony legally sufficient to support a judgment, Dr. Beitsch's opinion testimony was required to be expressed as "more likely than not" or "probably" true. According to Plaintiffs, Dr. Beitsch carefully opined that the 2017 Surgery was a potentially life-saving surgery due to Ms. Pierre's increased risk. He, however, failed to offer any evidence to prove that Ms. Pierre more likely than not would have developed breast cancer in her lifetime, which Plaintiffs claim was required to establish that the 2017 Surgery was likely necessary or lifesaving. Indeed, Plaintiffs emphasize Dr. Beitsch's calculation was that Ms. Pierre's life-time risk of developing cancer was 48%, foreclosing any opinion that she would have more likely than not developed cancer in her lifetime. Plaintiffs, thus, contend that Dr. Beitsch could not say to a level of medical probability that the 2017 Surgery saved her life. As a result, Plaintiffs contend that Dr. Beitsch's testimony was speculative and irrelevant.

Plaintiffs further contend that, even assuming Dr. Beitsch's testimony was relevant and admissible evidence under La. C.E. art. 401, in the context of this case, the probative value of his testimony was substantially outweighed by its prejudicial effect. Plaintiffs contend that his testimony mislead the jury into believing that Ms. Pierre suffered no injuries at all; thus, they contend that this evidence should have been excluded under La. C.E. art. 403.

Defendants counter that Plaintiffs waived their objection to Dr. Beitsch's testimony. In support, they cite Plaintiffs' failure to make a contemporaneous objection at trial to this testimony. Alternatively, Defendants contend that the trial court did not abuse its vast discretion in denying the Motion in Limine. Defendants emphasize that Plaintiffs cite no authority for their contention that, in order to qualify as a relevant admissible opinion testimony legally sufficient to support a judgment, Dr. Beitsch's rebuttal testimony was required to be expressed as "more likely than not" or "probably" true. Regardless, Defendants point out that Dr. Beitsch did testify, with reasonable scientific certainty, that Ms. Pierre received substantial benefit from the 2017 Surgery in the form of a reduced risk of cancer, rebutting Plaintiffs' unnecessary surgery allegation. Dr. Beitsch appropriately testified that he had calculated Ms. Pierre's lifetime risk of breast cancer before the 2017 Surgery at 48% and that after the surgery, her lifetime risk had decreased to less than 5%. Thus, his testimony was properly used to rebut Plaintiffs' allegation that the 2017 Surgery was wholly unnecessary.

Defendants further counter that Plaintiffs' argument that the trial court's admission of Dr. Beitsch's testimony had a substantial effect on the outcome of the trial is belied by Ms. Pierre's testimony that she initially viewed the 2017 Surgery as life-saving, coupled with Dr. Colfry's characterization of Ms. Pierre as "a high-risk patient" based on her family history and his description of the 2017 Surgery as a "risk-reducing prophylactic mastectomy."

We conclude that the trial court did not abuse its discretion in denying the Motion in Limine. The Motion in Limine was based on Dr. Beistch's anticipated opinion testimony that the 2017 Surgery was "potentially a life-saving surgery." As Defendants contend, Plaintiffs opened the door to a discussion of the potential

17

benefits of the 2017 Surgery by alleging in their petition that the 2017 Surgery was an unnecessary surgery. Likewise, as Defendants' contend, Plaintiffs' argument that Dr. Beistch's testimony was subject to a "more likely than not" standard is without any cited support.

The substance of Dr. Beitsch's opinion testimony that the 2017 Surgery was "potentially a life-saving surgery" was that, absent the surgery, Ms. Pierre would still be at high risk of breast cancer. Dr. Beitsch's opinion testimony was, in essence, that the 2017 Surgery was a risk-reducing one. This same opinion was voiced at trial by Ms. Pierre's own doctor, Dr. Colfry. The jury, as Defendants point out, heard Dr. Colfry testify, in his video deposition that was played at trial, that the 2017 Surgery was a risk-reducing surgery. Dr. Beitsch's description of the 2017 Surgery as a potentially life-saving surgery was no different. As Defendants' attorney pointed out at oral argument before this Court, the language Dr. Beitsch used to describe the 2017 Surgery—a "potentially life-saving surgery"—was not very different from the language Ms. Pierre's own doctor, Dr. Colfry, used—a "risk reducing prophylactic mastectomy." Both doctors' descriptions of the 2017 Surgery expressed the same opinion—but for the 2017 Surgery, Ms. Pierre's risk of developing breast cancer would have been higher. Accordingly, we find no abuse of discretion in the trial court's denial of the Motion in Limine.

Given our finding that the trial court did not abuse its discretion, we pretermit Defendants' waiver argument. *See Joseph v. Williams*, 12-0675, p. 13, n.10 (La. App. 4 Cir. 11/14/12), 105 So.3d 207, 216 (pretermitting the procedural, waiver issue).[10] We also pretermit Plaintiffs' argument regarding the cumulative

---

[10] Nonetheless, we quote our observations regarding the waiver issue set forth in *Joseph*, 12-0675, p. 13, n.10, 105 So.3d at 216:

18

effect of evidentiary errors. Hence, Plaintiffs' argument regarding the trial court's denial of the Motion in Limine is unpersuasive.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED**

---

Insofar as the lack of a contemporaneous objection, the Louisiana Code of Evidence (La. C.E. art. 103), unlike the Federal Rules of Evidence, is silent on whether a party is required to renew an evidentiary objection on which a definite ruling is obtained pre-trial by motion in limine in order to preserve that claim for appeal. The federal rules of evidence expressly provide that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Federal Rules of Evidence Rule 103(b). As a commentator points out, this provision, which was added to the federal rule in 2000, eliminates the procedural trap asserted here because it "apparently eliminates the need for a party to make continuous objections, or to make an objection 'general' to a line of questioning." Frank L. Maraist, 19 LOUISIANA CIVIL LAW TREATISE, EVIDENCE AND PROOF § 2.7 (2012 ed.). The commentator further points out that before the 2000 amendment "federal courts adhered to the rule that a motion in limine is insufficient to preserve error in the admission of evidence where the contemporaneous objection requirement of Rule 103 is not met." *Id.* The commentator still further points out that "[i]f evidence is deemed admissible on a motion in limine, the opponent probably should reurge the objection when the evidence is offered at trial."

*Id.*; b*ut see Maldonado v. Kiewit Louisiana Co*., 12-1868, 12-1869, p. 15 (La. App. 1 Cir. 5/30/14), 152 So.3d 909, 923 (citing *Lafleur v. John Deere Co*., 491 So.2d 624, 632 (La. 1986), and rejecting a waiver argument).